# Case No. 4,847.

## FLAGG v. MANN et al.

[2 Sumn. 486.] [1]

Circuit Court, D. Massachusetts. May, 1837.

[1] [Reported by Charles Sumner, Esq.]

B. Rand and C. G. Loring, for complainant.

Mann & Adams, J. Mason, and F. Dexter, for defendants.

S. Greenleaf and W. R. P. Washburn, for defendant Fuller.

STORY, Circuit Justice. This is the case of a suit in equity, and has been argued with great ability and learning on the merits by the counsel on all sides, at the hearing at the present term. The facts are very complicated, the documents very voluminous, and the evidence in various parts in direct conflict. The questions of law, too, involved in the cause, are not a few, and some of them not without difficulty or novelty in their actual application to the circumstances of the cause. I have, therefore, taken time to consider and examine the record; and I shall now proceed to deliver my judgment.

It is obvious, that the whole right of the plaintiff (Flagg) to maintain the present bill rests essentially upon the truth of the allegations in the bill as to the agreement between Mann and himself on or before the 13th of May, 1831, to purchase the premises at their mutual expense and for their mutual benefit, and to perfect the title thereto, and to extinguish the claims (if any) of the Frye heirs, and also the claims of Walker and Fisher. If the agreement was never made, in substance, as it is alleged; or having been made, if it was never afterwards carried into effect by the parties, but was definitively abandoned; then the whole foundation of the plaintiff's case is gone, without mooting any other of the questions raised in the cause. If, on the other hand, that agreement is established, and is a subsisting agreement, then the other questions in the cause must necessarily be discussed and disposed of. In the natural order of the questions, it seems proper in the first place to ascertain, whether any such agreement was made, as is stated in the bill; and if so, whether it has been abandoned. The agreement between Flagg and Mann, as stated in the bill, consists of four distinct parts: (1) To purchase and procure for themselves for their mutual and equal benefit, and at their mutual and equal expense, a complete and perfect title to the premises. For this purpose, (2) to purchase of Luther Richardson his title to the premises, giving him therefor, if his title should be found to be good and sufficient to enable them to hold the same, the sum of $9,000, subject, however, to the deduction of the amount of the subsisting incumbrances thereon; (3) to extinguish the real or pretended title of the Frye heirs to the premises; and (4) to pay the sums due to Walker and Fisher, as subsisting incumbrances thereon. There is also a charge in the bill, that the deed was procured from Luther Richardson, in pursuance of the agreement.

The defendant, Mann, by his answer denies, that there ever was any agreement made between him and the plaintiff to procure for their common benefit a perfect title. But in reference thereto he says, that on the 13th of May, 1831, Flagg, and himself, understanding that Luther Richardson claimed an equity of redemption in the premises in virtue of the obligation of Walker and Fisher, notwithstanding the expiration of the five years, and believing the amount due to Walker and Fisher to be about $6,000 only, and knowing the claim of the Frye heirs, but not knowing or having heard, that Luther Richardson had, before the conveyance to Walker and Fisher, made a conveyance of the premises to Prentiss Richardson, and not knowing or ever having heard, that Samuel Frye, the guardian, had not, before fixing the time and place of sale, taken the oath prescribed by law; but supposing the claim of the Frye heirs to be founded on the want of the notifications of the said sale being duly posted, did verbally agree with each other to offer, and did offer to Luther Richardson, to purchase of him his right and title in the premises, and to give him for the same, when clear of incumbrances, if they should be satisfied with his title, the sum of $9,000, provided a good and clear title were made to them within three years from that time; which offer was accepted and agreed to by him (Luther Richardson). In pursuance of the offer and acceptance Luther Richardson made the quitclaim to them (Mann and Flagg), but did not deliver the same, nor was the same accepted by them as his deed, the said contract being still conditional and incomplete, and his (Luther Richardson's) wife, not having signed the deed, as it was agreed she should. But the deed was left at Mann's office to be afterwards completed and delivered, or withdrawn by Luther according to the election of Mann and Flagg. The deed was not recorded until the 15th of February, 1832, at which time it was procured to be recorded by Flagg, without the knowledge or assent of Mann. Mann by his answer further denies, that he and the plaintiff ever agreed with Luther Richardson to pay to Walker and Fisher any sum or sums of money whatever. But he admits that he and the plaintiff did make their note for $3,500, payable to Luther Richardson, and delivered the same to Ames, to remain in his hands, until they had examined the records of deeds and of probate, and had taken the advice of Samuel Hoar, Esq. respecting Luther Richardson's title to the premises. And if, after such execution, Mann and Flagg should elect to proceed with the negotiation, then the note was to be given up to them, and they were to give their obligation to Luther Richardson, to pay the sum of $9000, whenever he should within three months make to them a good title to the premises free from all incumbrances; otherwise the note and deed were to be given up and the negotiation to be wholly abandoned. Mann has annexed to his answer a copy of the form of the obligation, which, he says, was drafted by him, and approved by Luther Richardson, to be given in case Mann and Flagg elected to proceed with the negotiation. Mann further in his answer states, that he received Mr. Hoar's opinion, a copy of which is annexed to the answer, and is unfavorable to the title of Luther Richardson to redeem Walker and Fisher after the lapse of the five years. He showed it to the plaintiff; and he afterwards examined the records of deeds and of probate; and there on the 17th of May, 1831, he first ascertained, that a conveyance had been made by Luther Richardson to Prentiss Richardson before the deed to Walker and Fisher; and also that it did not appear on the probate records, that Samuel Frye had, before fixing the time and place of sale, taken the oath prescribed by law in such cases; and that he and Flagg

were, on the 18th of the same month, advised by Isaac Fiske, Esq. whom they consulted, that the want of such an oath was a fatal defect in the title. Upon the opinion of Mr. Hoar and Mr. Fiske so given, Flagg and Mann agreed to abandon the negotiation with Luther Richardson, and did wholly abandon the same; and a few days after he, Mann, gave notice thereof to Luther Richardson, and also notice to Ames, that the note was to be given up. Mann further denies by his answer, that after the 17th of May aforesaid he ever pretended or affected to co-operate, or gave Flagg to understand or believe, that he would co-operate with the plaintiff in measures to extinguish the claim of Walker and Fisher, or of the Frye heirs, or to perfect the title to the premises, as in the bill is alleged. He admits, however, that after the negotiation with Luther Richardson was so ended, he and Flagg and Thomas P. Goodhue, employed one Stephen Goodhue, as their agent, to go to Vermont, for their common benefit, to obtain conveyances of the claims of the Frye heirs; but he wholly failed to accomplish the object, and the attempt was abandoned; and with this, he insists, that all contract and agreement between himself and Flagg, respecting the premises, were at an end.

Such are the statements and denials of the answer in reference to the matter of the agreement between Flagg and Mann, charged in the bill; and so far as they are responsive to the matters charged in the bill, they are of course proper evidence in favor of Mann. The answer admits an agreement to purchase the title of Luther Richardson; but it insists, that it was a conditional purchase to be affected by future inquiries and events. In this respect it is not materially at variance with the allegations of the bill. The matters, which it controverts, are: 1. That there was any absolute delivery of the deed by Luther Richardson to Flagg and himself under the agreement. 2. That there was any stipulation in that agreement to pay Walker and Fisher's demands. 3. That there was any stipulation in that agreement to buy in and extinguish the claim of the Frye heirs for the common benefit of Mann and Flagg. 4. It sets up a positive abandonment of the agreement with Luther Richardson by the consent of Flagg; and as positive an abandonment of a subsequent agreement with Flagg for the purchase of the claims of the Frye heirs. Let us consider these points in their order.

1. The conditional delivery of the deed by Luther Richardson. The execution of the deed being admitted, and the deed found in the possession of Mann, and the allegation of a conditional delivery not being responsive to the charge in the bill, the answer is not evidence of it; but the onus probandi is on Mann to establish it. The suggestion is that the deed of Luther Richardson was im-

perfect; that it was to be executed by his wife, who was to release her dower; and that it was left in Mann's office as an imperfect instrument, until this was accomplished. Upon the face of the deed it was certainly contemplated, that it was to be signed by the wife. But this would not necessarily establish, that it was an essential ingredient, before it should have effect as to the husband, or that there was not a subsequent waiver of her signature. The case in support of the answer mainly rests on the testimony of John W. Coolidge, who was a student in Mann's office, and who states, that he was present on the 13th of May, 1831, and heard the agreement between Mann and Flagg, and Luther Richardson, who, with Ames, were all present in Mann's office. The papers, then produced and before the parties, were a deed from Luther Richardson, a bond from Walker and Fisher, with an assignment written thereon, to Flagg and Mann, and a note from them to Luther Richardson. The note was delivered to Ames, not to be delivered to Richardson, or to any other person, without the order of Flagg or Mann; and the deed, bond and assignment were left in the possession of Mann. He further states, that Mann and Flagg were to examine the records, and if they should conclude, after the examination and after consulting counsel, to retain the deed and assignment, they were to give a bond to Richardson, conditioned to pay him a certain sum, whenever his title should be adjudged good by the supreme court, and to take up their note lodged with Ames; and if, upon the examination, they concluded not to give their bond to Richardson, the deed and assignment were to be returned to the latter, and the note returned by Ames to them. He further states, that, a day or two after, a bond was partly prepared by Mann (the draft of which he verifies), in pursuance of the agreement, which Luther Richardson took away for examination. About the 22d of the same month of May he learned from Mann and Goodhue, that Mann had discovered the defect in the title of Luther Richardson, from the want of taking the oath at the proper time before the guardianship sale. In November, 1831, he heard Mann ask Luther Richardson, how long it was, after the note was made and left with Ames, when he gave him notice, that his (Luther Richardson's) title was good for nothing, and that they should do nothing more, and requested him to call and take his papers. Richardson answered, it was about a fortnight. The witness farther states, that he understood from the parties, that Luther Richardson's wife was to sign the deed of her husband. The draft of the bond referred to by the witness goes far to corroborate his testimony, as to some material facts. But it leaves the point now under consideration wholly untouched, for

the draft is imperfect. There is nothing in it, which leads in the slightest degree to the conclusion, that the deed of Luther Richardson had not been delivered, or that the delivery was conditional.

Without in the slightest degree impeaching the integrity of the witness, there are circumstances in the case, which lead one to suspect, that there may be some errors in his testimony on several points. Upon his cross-examination there is manifestly some hesitation and want of recollection as to circumstances connected with and included in his direct examination. But a more material circumstance, is that in his second deposition he qualifies his former deposition in several important particulars. His first deposition affirms and proceeds on the affirmation throughout, that he was not in the same room with the parties during all their negotiations and conversations; but that he was a part of the time in an adjoining room, and was called into the other room to witness the transactions. In his second deposition, taken about two years afterwards, he expresses a doubt, whether he was not in the same room with the parties during all the transactions. There are, however, other intrinsic circumstances in the case, as well as other positive testimony, which do materially weaken the force of the conclusions to be drawn from Coolidge's testimony. In the first place, it is admitted, that, after the deed was executed by Richardson, it was left in Mann's office with Mann, and the note of Flagg and Mann was delivered to Ames. It is difficult to reconcile these facts with the notion, that the transaction was not then treated as consummated between the parties; that the deed was not treated, as absolutely delivered by Richardson to Flagg and Mann, and the note delivered to Ames as an operative instrument, each of them being liable nevertheless to be rescinded by future events; that is, to speak technically, that both instruments were to be avoided by conditions subsequent, and were not dependent for their original validity upon conditions precedent not yet performed. Neither the deed, nor the note, has ever since been delivered up. The deed remains in Mann's possession and custody, and so far as this fact goes, it affords a strong presumption of an actual delivery in conformity to the terms of the deed. It is common learning, that when a deed of grant is found in the possession of the grantee, it affords a just presumption of a due delivery thereof, because it then, and not otherwise, would be in the proper custody. The answer in effect insists, that the instrument was never delivered as the deed of Richardson, but was a mere escrow. Now, there is a technical difficulty in this suggestion; for an instrument can never be delivered as an escrow to the grantee himself. Co. Litt. 36a, is direct to this point. And though a court of equity

will not govern itself exclusively by technical principles of this sort, where the intentions of the parties would be thereby defeated; yet there must be the clearest evidence in such a case, what that intention is, and whether it will be so defeated; otherwise the rule of law must prevail.

The testimony of Luther Richardson, the grantor, is on this point most important. An objection is made to his testimony upon the ground of his being an incompetent witness by reason of his interest in the event of this suit. But I profess myself unable to perceive, what interest, legal or equitable, he has in this suit. He may have a feeling, and undoubtedly has, in favor of the plaintiff. But nothing decided in this suit can be given in evidence in support of any claim on his part; for it is res inter alios acta; and he has, therefore, nothing to gain or to lose by it. Besides; he has been cross-examined by the defendant with a full knowledge of the objection; and after that it is difficult to say, that in a court of equity he can be heard to make the objection. According to Richardson's testimony there was an absolute delivery of the deed and the assignment of Walker and Fisher's bond to Flagg and Mann; for, he says in direct terms, that he assigned the bond to them, and at the same time he gave them a quitclaim deed of the premises. His statement of the agreement between them and himself is as follows: "After various conversations and stating, that a suit was pending instituted by Frye's heirs respecting the title (a fact, which is admitted on all sides to be true), I agreed to sell my right to them for $3500, which was to be paid to me in case my title proved good against Frye's heirs; and a note for this sum was made by them, and deposited in the hands of Mr. Ames; and if the title of the Frye heirs prevailed and mine failed the note was to be given up." He adds, that by the terms of the agreement Flagg and Mann were not to pay any thing, unless the transaction with Walker and Fisher and their bond to him should prove to be a mortgage. He denies, that Flagg and Mann had a right to rescind the contract, until the title should be proved bad by a trial at law. He says, that the bond was not to be given in exchange for the note, but was to be a bond explanatory of the terms of the agreement; and that the note was to remain in Ames's possession, until his title should be settled at law. He annexes a copy of the imperfect bond drawn up by Mann, and handed to him, which contains a part only of the recitals of that referred to by Coolidge. He says, that in June or July, 1831, Mann stated to him that he doubted, whether the title was good for any thing; and about the 10th of August, 1831, Mann informed him, that he did not consider the title worth a quarter of a dollar, and he would have nothing more to do with it. About that time the witness called on Ames with Mann to exchange papers; but Flagg did not agree to

it; and no exchange was ever made. He farther adds; "In regard to my title to the said bond, Flagg and Mann were to perfect it at their own expense. There was no time fixed, within which I was to make a good title, because they were to see to that. But I was not to be paid the money until the decision of a court of law, establishing the title. There was nothing agreed upon relative to the term of three years." I observe, at present, that there is nothing in this deposition pointing to any agreement for the purchase of the claim by the Frye heirs between Flagg and Mann, and Richardson. But the only purchase apparently contemplated was the outstanding title in Walker and Fisher.

Ames's testimony as to the transaction is to this effect. That Mann stated, that he and Flagg had made a bargain with Luther Richardson, and were to buy his interest in that estate and were to allow him the price, named in the quitclaim deed ($9,000) from Richardson to them, deducting therefrom such sum as should be found due from Richardson to Walker and Fisher, provided the title should prove good. Richardson did not know the exact sum due to Walker and Fisher; but he stated a sum as being due, which the witness thinks was about $5,500. Mann expressed a confidence, that the transaction between Richardson and Walker and Fisher was a mortgage. Mann was to examine the records at Cambridge, and find out, how much was due to Walker and Fisher. A note for $3,500, being the supposed balance, which was coming to Richardson, was drawn (the witness thinks by himself), and signed by Flagg and Mann, and deposited, for the time, with the witness. It was stated by Mann as the bargain of the parties, that when the amount due to Walker and Fisher was ascertained, that the note should be taken up, and Flagg and Mann's bond should be given to Richardson, conditioned to pay him the balance of the price of the land, provided the title proved good. Richardson, after some doubts, and consulting the witness, finally signed the deed, and the assignment of the bond of Walker and Fisher. The note was not negotiable. The deed and assignment were left on the table (in Mann's office), or taken by Flagg and Richardson for the purpose of having the deed acknowledged by Richardson. It was acknowledged on the same day, as the witness thinks, but is not positive. But when he last saw the deed and assignment on that day (the 13th of May) they were on the table in Mann's office. The next time he saw the deed was in August or September, 1831, when it was handed to him by Flagg. About the time when the information came out, that Mann and Adams had purchased the lands in question of the Frye heirs, Mann and Richardson came to the witness's office to take up the note. Richardson made no objection; and Mann took it away, and returned it again to the witness on the same day, saying, he had concluded to return it,

or words to that effect. It does not appear, that Flagg was, at the time, a party to these transactions. The witness adds, that in the latter part of the same month of May, Mann, under an injunction of secrecy, told him of a new and serious difficulty, the discovery, that the oath had not been properly taken by the guardian.

The testimony of Thomas P. Goodhue is, as far it goes, confirmatory of that of Ames and Richardson on this point; and its bearing on other points will hereafter be the subject of comment. He says, that Mann told him, that he thought the transaction of Richardson with Walker and Fisher operated as a mortgage. That on or about the 18th of May, 1831, he was informed by Mann and Flagg, that they were the owners of the Richardson title and interest in the premises, and that they were to pay $9,000, he thinks, in this way. They were to discharge the incumbrance of Walker and Fisher, and to pay the balance to Richardson. On the same day, he was also informed by them of the defect in Richardson's title from the omission of the guardian to take the oath at the prescribed time.

The testimony of another witness, Wood, is very cogent and positive. He says, that Mann told him, that he and Flagg had made the purchase of Richardson, and got their deed, and also an assignment of the bond or mortgage, and that they had agreed to give therefor $9,000. Mann took a paper from his drawer, and holding it up, said, this is our deed from Richardson, and we have given Richardson, for what is coming to him our security for the same, and the security is deposited or put into the hands of Seth Ames. At another time, Mann inquired of the witness, whether Richardson's wife had signed the deed to Walker and Fisher; and Mann said, if she had, it was as well, as if she had signed the deed of her husband to Flagg and himself.

Now, upon this posture of the direct evidence bearing on this point, I confess, that I am reluctantly driven to the conclusion, that it is not satisfactory to establish, that the delivery of Richardson's deed was not absolute, or that it was an imperfect inchoate transaction. Loose, and confidential, and inaccurate, as the whole proceedings were to attain the ends contemplated by the parties, I find no warrant in them to justify the court in saying, that the deed of Richardson was never delivered as a deed, but merely as an escrow. The indirect evidence of the Goodhues, and of Hunt, as well as of some others of the witnesses, does not fortify this part of the case in favor of Mann. But, if it weighs at all, it corroborates the view taken on the other side, that Mann treated the deed, as complete in its delivery, however it might be subject to conditions subsequent. It has also been remarked, and the criticism is correct, that Mann, in his answer to the bill in the state court, has not ventured positively

to deny, that the deed was delivered, but has only said, that the said deed and bond were both left in his possession, but as he "then believed and now believes, not delivered" to Flagg and Mann, or either of them, as a consummation of the said conveyance and assignment, &c.

In regard to the second point (2), whether there was any stipulation in the agreement, on the part of Flagg and Mann, to pay Walker and Fisher's demands, I have still more difficulty upon the evidence in withholding my assent, that there was such a stipulation. The extraordinary result would otherwise arise, that a contract, which could only be consummated by establishing a perfect title in Richardson, was wholly dependent for its completion upon the good will of Flagg and Mann. If they did not choose to redeem Walker and Fisher's mortgage (admitting it to be such), or to establish the title of Richardson by a suit against Walker and Fisher, it is plain, that Richardson could never entitle himself to the balance intended to be secured by the note. Richardson had not the means, neither had he, strictly speaking, any right to redeem the mortgage, or to sue Walker and Fisher thereon, after his assignment of their bond to Flagg and Mann. The testimony of Richardson and Ames are full to the purpose of establishing this point; and I cannot but think, that, under all the circumstances, they overcome the denials of the answer. That answer has, indeed, been assailed in many particulars, some of which may come under our notice hereafter.

The next point is (3) whether the agreement between Flagg and Mann contained any stipulation for the extinguishment of the title of the Frye heirs. The answer, as we have seen, denies it. It does, however, admit, that after the defects in Richardson's title, from the want of the guardian's taking the proper oath, and the prior conveyance to Prentiss Richardson, were known to him (Mann), which was about the 17th of the same month of May, Flagg and he, together with Thomas P. Goodhue, did, for their mutual benefit, and at their mutual expense, employ Stephen Goodhue (who was also to have an interest) to purchase up the title of the Frye heirs, and that he went, about the 25th of the same month. to Vermont for that purpose; but he failed in the attempt. It seems, that the object of the intervention of T. P. Goodhue was not to interfere with the rights of Richardson; but to procure a title to the other moiety of the land of the Frye heirs, which had been sold at the guardian's sale to another purchaser. But the answer insists, that, upon the failure of the Vermont expedition, the agreement ended between Mann and Flagg for any joint purchase of the claim of the Frye heirs. If there could be any doubt, as to the point of the intended purchase from the Frye heirs, it would be entirely removed by the concurrent testimony of the Goodhues. Whether that agreement was contemporaneous with the purchase from Richardson, or whether it took place after the discovery of the alleged defects in his title, is not, perhaps, important to the objects of the bill, if the purchase of Richardson was not, at that time, rescinded, and if the agreement to purchase, for mutual account, the claim of the Frye heirs, was not abandoned with the failure of the Vermont expedition.

And this leads me to the remaining point under this head; and that is (4) whether there has been any absolute abandonment, by the consent of all parties, of the purchase from Richardson, and of the intended purchase from the Frye heirs, or of either. Now, in respect to these points, the onus probandi is properly of the defendants, since they constitute matter set up in avoidance of the objects of the bill.

And first in regard to the abandonment of the purchase from Richardson. Unless I am greatly misled, there is no sufficient evidence in the case to establish the fact, that Flagg ever abandoned that purchase. On the contrary, it seems to me, that the current of the evidence, and the acts of the parties, with some few exceptions, show, that Flagg insisted upon the purchase and his rights under it. And, unless some clear and deliberate abandonment is shown, the purchase must, in contemplation of law, be deemed a continuing contract. Unless Flagg did abandon the purchase, it could not be rescinded or repudiated by Mann alone, or by Richardson and Mann together. Richardson wholly denies any abandonment to have been carried into effect; and Mann's return of the note to Ames, after he had received it, shows, that up to that period (which was in the latter part of July, or the beginning of August, 1831), there had been no definitive rescission of it. And none with the consent of Flagg was then accomplished, even if the other parties had been willing. Mann, by his answer, insists, however, that there was a definitive abandonment of the purchase on the 17th of May, 1831, in consequence of Mr. Hoar's opinion, and the other discoveries of the defects in Richardson's title, already alluded to. In this, he is, I will not say, certainly, but in all human probability, mistaken. In his answer to the supplemental bill, he admits, that when the expedition to Vermont was undertaken, the title of Richardson was relied on by himself and Flagg. He says, "Mr. Goodhue left Lowell for the purpose of going to Vermont, I think, on the 25th or 26th day of May, 1831. He went for the purpose of purchasing the title of the Frye heirs to the Paddy Camp lands (the premises in question), with the agreement, that if he did purchase it, it should be for the benefit of said Flagg and myself, so far as he could hold by Luther Richardson's title, and for his and his brother's interest, so far as they might be able to hold it by a quitclaim deed, which Wood had agreed to give them."

The testimony of both the Goodhues goes strongly to show, that there could not, at the time, have been such an abandonment. For, after the failure and return of Stephen Goodhue from the Vermont expedition, there having been in the meantime a discovery by Hildreth's testimony, that the oath had been properly taken before the guardian's sale, Mann told one of the Goodhues, that it was well, that they had not purchased the interest of the Frye heirs, as there was then no necessity for doing so. Indeed, after the discovery of Hildreth's testimony, and before the return of Stephen Goodhue from Vermont, Mann proposed to have a messenger sent to recall him; but it was not done, because they concluded, that he had already effected all he would be able to effect with the Frye heirs. Both of the Goodhues strenuously deny, that they ever had any knowledge, that the purchase from Richardson was abandoned by Flagg and Mann. On the contrary, their testimony leads to the conclusion, that they understood and believed, that the extinguishment of the claim of the Frye heirs was always contemplated to be in aid and not in exclusion of the title of Richardson. Even Coolidge does not pretend, that he ever knew of any actual abandonment of the purchase by Mann and Flagg, although certainly, as he was much in the confidence of the parties, and particularly of Mann, he would have been in a situation probably to have known it, if it had been definitely settled between them. I admit, that there is evidence in behalf of the defendants, which contains statements made in conversations with Mann, in which he (Mann) said, the purchase had been abandoned. But, certainly, his own statements are not either proper or satisfactory evidence in his favor for such a purpose. The testimony of Isaac Fiske seems to me to corroborate the view already taken upon this point; for it shows, that on the 18th of May, Mann, after a knowledge of the defects of Richardson's title, was taking steps to make that title good, and to protect it by an extinguishment of the claim of the Frye heirs.

The testimony of William Heard (the brother-in-law of Mann) is, indeed, in favor of the abandonment. He says, that about the first of June, 1831, he had a conversation with Flagg and Mann, and he asked them, how they came on in purchasing the Paddy Camp lands (the lands in question), to which Mann replied, "We have done with that;" no remark was made by Flagg on that point. Afterwards, in August of the same year, Mann, in his office, handed a bundle of papers to Flagg, and said the papers related to the transactions between him and Flagg and Luther Richardson, and that Flagg was to take up their note, and he called on the witness to take notice, that he had delivered up the papers. Flagg took up the papers, and made no reply. Walker also states, that Luther Richardson, in the latter part of May, 1831, told him, that Mann and Flagg had given up the bargain, as they thought the title was not good for any thing. Fisher says, that in May or July, he cannot tell which, Luther Richardson also told him, that Flagg and Mann had abandoned their purchase of him. But, at another time, he told him, that Flagg was not willing.

It is certainly difficult to reconcile all the testimony on this point of abandonment of the purchase from Richardson. If it is reconcilable at all, it seems to me, that it is so upon the supposition, that Mann's opinion as to the validity and value of the purchase varied at different times, from the different views, which he took, at those times, of the state of Richardson's title, and of the real or supposed defects in it. At some times he had great confidence in the title; at others, he appears to have thought it good for nothing; and he was ready to abandon the purchase. But his mind fluctuated from time to time; and it appears that there never was any final and conclusive abandonment of that title agreed to and acted on by all the parties in interest, Mann, Flagg and Richardson.

In regard to the abandonment of the joint agreement of Mann and Flagg for the purchase of the claim of the Frye heirs, there is still less evidence in favor of Mann's allegations in his answer. The Goodhues certainly did not understand, that there was any abandonment after the failure of the Vermont expedition; and the language of Mann to them, as detailed in their depositions, goes strongly to show, that he never gave up either the intention or the hope of purchasing out the Frye heirs, and that he encouraged them to believe, that a purchase might be effected. They had no notice from Mann, that Flagg had withdrawn from the object. It is plain that the subsequent negotiations of Mann with the Frye heirs were kept concealed from Flagg; and this fact sufficiently shows, that Mann contemplated excluding Flagg from the benefit of the future purchase. But how this can furnish any proof, that Flagg had abandoned his rights, real or supposed, under the agreement, I profess not to be able to comprehend. If the agreement was not abandoned, this conduct of Mann was a meditated fraud on Flagg. If it was abandoned the onus probandi to establish it is on Mann; and it should be by some proofs, clear, determinate, and full; and not by equivocal acts, or language, or intimations. The proofs in the case do not (I regret to say) enable me to give an unlimited confidence to the allegations of Mann in his answer. There are many circumstances, in which that answer is strongly assailed, if not completely overturned by the proofs. Some of these circumstances are to collateral points, on which, therefore, I do not dwell, though in summing up to a jury they might be very important as tests of credibility. After a careful survey of the evidence it seems to me,

that the original agreement between Flagg and Mann, as stated in the bill, is fairly made out; that it has never been abandoned by the consent of both parties; and that without such consent it was, under the circumstances, incapable of any abandonment by Mann, operative in point of law to destroy it. Assuming, however, that such an abandonment of it by Mann would have been operative in point of law, if openly, fully, and absolutely made; still I should be of opinion, that until it was so made, the acts of Mann to effect a purchase from the Frye heirs, secretly done, and thereby lulling Flagg into a false security, would, in a court of equity, be deemed a fraud upon Flagg, and would not be permitted to avail Mann as a ground to defeat his agreement.

We are next led to the consideration of another point in the defence, which is directly brought forward in the answer. It is, that the agreement, even if clearly made out in point of fact, is void in law, as a parol agreement respecting the purchase of lands, within the purview of the statute of frauds of Massachusetts of the 10th of March, 1784 (St. 1783, c. 37), which enacts, that no action shall be maintained upon any contract or sale of lands, or any interest in or concerning the same, unless the agreement is in writing. It seems not disputed at the bar, that the present agreement falls within the predicament of the statute, unless it is extracted from it by the fact, that some title was, at the time of the purchase from the Frye heirs, vested in Flagg and Mann under the deed from Richardson to them, or that that deed, connected with the agreement between Flagg and Mann, created per se a fiduciary relation, which would make the purchase by operation of law a purchase in trust for their joint benefit. It is a well known rule of the common law, that, where two persons are in possession of lands by an imperfect, and even by a tortious title, such as a title by disseisin, a release to one of them will enure for the benefit of both. The citations at the bar from Co. Litt. 194, 195, 275–277, are fully in point. But the doctrines entertained on this subject by courts of equity are far more broad and comprehensive. They proceed upon the maxim of general justice, so exquisitely enforced by Cicero: "In rebus minoribus socium fallere, turpissimum est; neque injuria; propterea quod auxilium sibi se putat adjunxisse, qui cum altero rem communicavit. Ad cujus igitur fidem confugiet, cum per ejus fidem laeditur qui se commiserit?" Cicero, pro Roscio, Am. c. 40. That maxim is but an exposition of the doctrine, that if a purchase is made by the parties so interested by mutual agreement, neither party can rightfully exclude the other from what was intended to be for the common benefit; and that if one of the parties by private intrigue seeks to obtain without contract, but in violation of his good faith to his co-tenants or partners, a private benefit to himself in things touching the com-

mon right, it is a fraud, which shall turn him into a trustee for the benefit of all. Hence it is, that in cases of partnership, a contract made by one partner is deemed to be made for the benefit of all; for there is an implied obligation to act for the common benefit. In Featherstonhaugh v. Fenwick, 17 Ves. 298, where one partner had secretly for his own benefit obtained a renewal of a lease of the premises, where the joint trade was carried on, Sir William Grant decided, that the lease was a trust for the benefit of the partnership. "It is clear" (said he) "that one partner cannot treat privately and behind the backs of his copartners for a lease of the premises, where the joint trade is carried on for his individual benefit. If he does so treat, and obtains a lease in his own name, it is a trust for the partnership." There is nothing new in this doctrine, for the same point was decided a century before in the case of Palmer v. Young, 1 Vern. 276, 1 Eq. Cas. Abr. 380. In Carter v. Horne, Id. 7, pl. 13, it was held by the court, that where two persons agree for the purchase of an estate in moieties, neither of the purchasers has a right to secure any private or personal benefit to himself; but whatever is obtained of advantage, in paying off incumbrances, is deemed in equity to be for their mutual benefit and on a mutual trust between them. See 2 Fonbl. Eq. 118. Fawcet v. Whitehouse, 1 Russ. & M. 132, was decided on the same principle, as was also Burton v. Wookey, 6 Madd. 367.

Mr. Chancellor Kent, in Van Horne v. Fonda, 5 Johns. Ch. 388, 407, applied it to a case in many circumstances resembling the present. His language on that occasion has his usual moral strength, and persuasive cogency of reasoning. "I will not say, however," (said he), "that one tenant in common may not in any case purchase an outstanding title for his exclusive benefit. But when two devisees are in possession under an imperfect title, derived from their common ancestor (the very case before him), there would seem, naturally and equitably, to arise an obligation between them, resulting from their joint claims and community of interest, that one of them should not affect the claim to the prejudice of the other, &c. It is not consistent with good faith, nor with the duty, which the connexion of the parties as the claimants of a common subject created, that one of them should be able, without the consent of the other, to buy in an outstanding title, and appropriate the whole subject to himself, and thus undermine and oust his companion. It would be repugnant to a sense of refined and accurate justice. It would be immoral, because it would be against the reciprocal obligation to do nothing to the prejudice of each other's equal claim, which the relationship of the parties, as joint devisees, created. Community of interest produces a community of duty; and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding incum-

brance, or an adverse title, to disseise and expel his co-tenant. It cannot be tolerated, when applied to a common subject, in which the parties had equal concern, and which created a moral obligation to deal candidly and benevolently with each other, and to cause no harm to their joint interest." The present case requires the application of principles of far less stringency and comprehensiveness. In the present case the community of interest (if any) arose from direct contract between the parties; and from a direct agreement, not rescinded or abandoned, to purchase the original, as well as the outstanding, title upon joint account. In such a case there would seem to be no room for doubt, that if the parties stood in the relation of co-tenants, or joint owners, a court of equity ought to deem the purchase of an outstanding incumbrance or adverse title by one to be a trust for the benefit of both, if not ex contractu, at all events in foro conscientiae. The case of Featherstonhaugh v. Fenwick, 17 Ves. 310, 312, was decided upon this latter ground. And let me here remark, that the partnership in that case was dissoluble at pleasure. But still, as it was not actually dissolved, and as no notice was given of the intention to dissolve it, or to seek a renewal of the lease, to the other partner, it was held to be a renewal in trust for the partnership; for it was an attempt to secure clandestinely an undue advantage to the injury of that partner.

Pothier states the same doctrine in a still more general form, as having for its support a just foundation in the principles of natural equity. He denies, that one partner has a right to dissolve a partnership for his own peculiar advantage to the injury of the other partners. The renunciation (or abandonment) of the society (says he) must be made in good faith and at a reasonable time. "Debet esse facta bonâ fide et tempestivè." The renunciation is not made in good faith, when a partner renounces to appropriate to himself alone the profit which the partners had proposed to acquire in contracting that relation. And Pothier applies the doctrine to the case, not of general partners only, but to joint agreements to purchase property on speculation; putting the case of a joint agreement by two booksellers to purchase a library on joint account; where he holds, that one cannot renounce without the consent of the other, and purchase on his own sole account. Pothier, Traité de Sociêtê, art. 150. The civil law enforces the same enlightened morality. "At cum aliquis renunciaverit societati, (say the Institutes) solvitur societas. Sed plane, si quis callidè in hoc renunciaverit societati, ut obveniens aliquod lucrum solus habeat, cogitur hoc lucrum communicare." Inst. lib. 3, tit. 26. The same doctrine is fully established and illustrated in the Pandects, of which I will cite a single passage, peculiarly applicable to the very abandonment of the joint agreement for the purchase of the Paddy Camp lands, set up by Mann in the present case. "Item, si societatem ineamus ad aliquam rem emendam, deinde solus volueris eam emere; ideoque renûnciaveris, societati ut solus emeres; teneberis, quanti interest meâ." Dig. lib. 17, tit. 2, l. 65, § 4. A wholesome and equitable principle, which by declaring the sole purchase to be for the joint benefit, takes away the temptation to commit a dishonest act, founded in the desire of obtaining a selfish gain to the injury of a co-contractor, and thus adds strength to wavering virtue, by making good faith an essential ingredient in the validity of the purchase. There is not, therefore, any novelty in the doctrine of Mr. Chancellor Kent, notwithstanding the suggestion at the bar to the contrary; and it stands approved equally by ancient and modern authority, by the positive rule of the Roman law, the general recognition of continental Europe, and the actual jurisprudence of England and America.

If then a fiduciary relation did exist between Flagg and Mann, at the time of the purchases from Walker and Fisher and from the Frye heirs, it is clear, and indeed was admitted at the argument, that the purchases by Mann alone must be deemed in equity to be for the joint benefit of both. But the argument is, that this fiduciary relation does not arise from a mere common hope or expectation under the contract of the parties, but from a common interest in the subject-matter of the purchase, then vested and subsisting in the parties. A mere honorary obligation is not sufficient; nor will a parol agreement without a vested interest in the property give a rightful existence to the fiduciary relation.

Passing, for the present, the question as to the fiduciary relation, arising from mere contract, let us proceed to the consideration, whether the deed and assignment of Richardson to Flagg and Mann did convey any equitable title or interest to the latter in the premises. First, it is said, that Richardson derived no title to the premises under the guardian's deed to him in June, 1823, for want of the proper oath having been taken by the guardian prior to his fixing the time and place of sale. It is admitted, that by the decisions in Massachusetts such a defect is fatal to the title. Williams v. Reed, 5 Pick. 480. But it by no means follows that, therefore, the title is utterly void, and that nothing passed by the deed. On the contrary, the deed did pass a title to the premises, defeasible and defective, indeed, as to the Frye heirs, but good, as against all the rest of the world. It was not a void but a voidable conveyance, operative between the parties; and the seisin acquired under it by Richardson gave him a lawful estate in fee, good against all persons, except the minors and those claiming under them. Even a disseisor in possession has a lawful estate, which he may aliene

and the alienee will be deemed in rightful possession thereof against all persons not having a paramount title. A fortiori, Richardson had a rightful estate, having entered, not merely under color of title, but under a bonâ fide purchase without notice of any defect of title. The defect could be taken advantage of only by the Frye heirs and others deriving title under them within the time prescribed by the statute of 1819 (chapter 190, § 12). There is nothing in the case of Williams v. Reed, 5 Pick. 480, which impugns this doctrine. On the contrary it is tacitly admitted by that case. Until, then, the title of Richardson under the guardianship deed was actually avoided by the Frye heirs, and his seisin in the premises was ousted under a recovery against him by these heirs, he must be deemed, as to all other persons, to be the lawful owner of the premises, and entitled as such to hold and convey the same by mortgage or otherwise. It seems to me wholly incompetent for Mann, deriving the title together with Flagg by purchase from Richardson, to set up the outstanding adverse title of the Frye heirs, in order to defeat the equitable rights of Flagg, accruing from the fiduciary relation created between them by that purchase, if Richardson had at the time any title in the premises.

The matter of fact, whether the oath was duly taken or not, is, however, in dispute; and upon the actual state of the evidence, if it were, as in my judgment it is not, a point essential to be decided in the present controversy, I should direct it to be tried by a jury upon an issue. I think, that it is not essential; because, in the first place, the actual title of Richardson, supposing it not to be parted with, and, putting out of sight the mortgages, and other incumbrances created by Richardson (which will presently be considered), would, upon his conveyance to Flagg and Mann, be sufficient to create a privity of title and a fiduciary relation between them, such as, upon the doctrine above stated, would raise a trust for their mutual benefit in the purchase from the Frye heirs, supposing the claim of the latter to be valid and unimpeachable. I think, farther, that, inasmuch as the agreement for the purchase from Richardson was made by Flagg and Mann, avowedly for the purpose of protecting themselves against the claim of the Frye heirs, and upon the necessary understanding, that it should be resisted by both, it is not now competent for Mann to violate that understanding, by interposing that claim to defeat the rights of Flagg under that agreement, if it be still a subsisting agreement. I do not here proceed upon any notion of an estoppel at the common law; but upon the principles of courts of equity in depriving a party of the advantages obtained by what they deem a constructive fraud.

But it is argued, that at the time of the conveyance of Richardson to Flagg and Mann, he had not a scintilla of title in the premises; but that he had parted with all his title, whatever it might be, to Walker and Fisher; so that at most his possession of the premises at the time was merely that of a tenant at sufferance. And this leads us directly to the consideration of the state of Richardson's title, with reference to the transactions with Walker and Fisher. The question is, whether the conveyance by the Richardsons to Walker and Fisher, connected with the other papers and circumstances, amounted to a mortgage or to a conditional sale of the premises. It seems admitted at the argument, that it must be one or the other; and therefore, if either be displaced, the other must prevail. This question is to be examined, not with the views, which a court of common law might be constrained to take of it, having reference solely to the jurisprudence, which it is bound to administer; but it must be examined with the enlarged views, which are embraced by courts of equity in recognizing what may be called equitable mortgages. A court of law may be compelled, in many cases, to say, that there is no mortgage, when a court of equity would not hesitate a moment in pronouncing, that there is an equitable mortgage. The case of Kelleran v. Brown, 4 Mass. 444, clearly recognized this distinction in Massachusetts; and, indeed, it pervades the system of equity jurisprudence on this subject. The state of the title of Luther Richardson in the premises, at the time of the transactions with Walker and Fisher, was as follows: It was subject to the two mortgages to Goodman, Saville & Kent. The equity of redemption had been attached, and sold on execution to Proctor, who had assigned it to Bennett. Subject to these incumbrances, the statute equity to redeem the premises against the sale on the execution had been vested in Prentiss Richardson, under the deed of release to him from his brother Luther. See Reed v. Bigelow, 5 Pick. 281. So that, in a legal point of view, all right of the latter thereto was extinguished. The only question, which could arise, would be, whether the conveyance of Luther to Prentiss Richardson was bonâ fide and absolute, or upon a secret trust in favor of Luther.

Now, upon a review of the evidence and circumstances of the case, it is clear to my mind, that the conveyance from Luther to Prentiss Richardson was not a bonâ fide and absolute sale, but was upon a secret trust for the benefit of Luther. It was made after the attachment and before the sale of the equity of redemption upon execution, and was probably designed to cover the equity under the sale from the reach of creditors. Both Luther and Prentiss Richardson, by their depositions, admit the fact, that the conveyance was not absolute. No actual consideration passed between them at the time; and both of them explicitly aver, that the con-

veyance was upon a secret trust for the benefit of Luther. Now, I admit, that this trust was, or at least might be, within the statute of frauds, and therefore not such as a court of equity would feel itself bound to enforce, if resisted by Prentiss Richardson. See Leman v. Whitley, 4 Russ. 427. But the trust was not utterly void between the parties; but it was, as a matter in conscience, obligatory between them. And if they chose voluntarily to act upon it, and to carry it into effect in the same manner, as if it had been in writing, and possessing a complete legal obligation, I know of no principle of law, which forbids the creation or the voluntary execution of such a parol trust by the parties, although a court of equity might not enforce the execution of it. Because a trust is created by parol contract, it does not necessarily follow, that it may not be enforced in equity. On the contrary, if it be afterwards admitted, and the party does not insist upon the defence of the statute of frauds, a court of equity will decree a specific performance. There are many cases to this effect. But I need not do more than refer to Barrell v. Joy, 16 Mass. 221; Cottington v. Fletcher, 2 Atk. 155; Croyston v. Banes, 1 Eq. Cas. Abr. 19; Forster v. Hale, 3 Ves. 696, 5 Ves. 308; Attorney General v. Sitwell, 1 Younge & C. Ex. 583, and 1 Fonbl. Eq. 29, bk. 1, c. 3, § 8, and note a; Hampton v. Spencer, 2 Vern. 288a. See, also, 2 Story, Eq. Jur. § 755, and cases there cited. And trusts, arising or resulting by the implication or construction of law, are. as we all know, expressly excepted from the operation of the statute of frauds. St. 1783, c. 37, § 3. Even if the original transaction between Luther and Prentiss Richardson was not upon a trust, yet it is manifest, that Prentiss, at the time of the conveyance by them to Walker and Fisher, held the title in trust for Luther, and claimed no interest whatsoever in the premises. He states the fact in his deposition, in the most explicit manner, that he then had no interest in the premises; that all his claim under the conveyance made to him by his brother was at that time satisfied; that the transaction with Walker and Fisher was for the sole benefit of his brother, and that he received no consideration whatsoever for signing the deed to them. Indeed, the bond to secure a reconveyance or a redemption of the premises within the five years, being given to Luther alone, demonstrates the truth of his statement in an entirely satisfactory manner. It appears to me, that, in the view of a court of equity (for I do not meddle with the question at law), the execution of the deed to Walker and Fisher, and the giving of the bond by them to Luther alone, with the assent of Prentiss, amounted to a complete execution of the trust between Luther and Prentiss, and is precisely the same in effect, as if Prentiss had first conveyed the premises to Luther, and the latter had then con-

veyed to Walker and Fisher, taking from them the bond. Courts of equity do not regard the forms of instruments; but they look to the intent, and give to the acts of the parties the construction, which that intent justifies and requires, as far as consistently with general principles it can be done. Here, then, is the case of an executed trust, which is wholly beyond the reach of the statute of frauds. It is plain, too, that Walker and Fisher understood, at the time, that Luther Richardson was the sole beneficial owner of the premises. Their bond recites the conveyance to them as being from Luther Richardson alone. The condition recites, "Whereas the above-named Luther Richardson has, by a deed of quitclaim, bearing even date herewith, conveyed to the above-bounden Walker and Fisher, all his right and title, &c. &c.;" and then the condition provides for a reconveyance to him. It seems to me, that Walker and Fisher, and all persons claiming under them, are estopped by the terms of this instrument from denying, at least in a court of equity, that all, which they took under the deed, was the right and title of Luther Richardson, Prentiss's formal title being extinguished by his joining in the deed; and that they were bound to reconvey all the right and title, which they so acquired. It would be unconscionable for them (and those claiming under them are in the same predicament) to set up the want of any legal title in Luther, in order to defeat the true operation of their bond, if otherwise it would make the conveyance to them a mortgage. If the objection had been stated at the time, it would (as we must all see) have been obviated by a separate conveyance from Prentiss to Luther, or by a recital in the deed, that Prentiss had the formal and Luther the beneficial interest in the premises. I am aware, that it has been said, that the reason for Luther Richardson's joining in the deed to Walker and Fisher was not to convey away his supposed title in the premises, but merely to give validity to his wife's relinquishment of dower in the premises. It appears to me, that the very form and purport of the deed contradict this argument. The deed purports to name Luther and Prentiss as grantors, and they both convey the premises. The name of the wife does not occur except in the common in testimonium clause. The bond, too, as we have seen, recognises the deed, as being a conveyance from Luther of his own right and title. The testimony of Walker and Fisher necessarily admits, that Luther Richardson claimed a right to the premises, as then subsisting in himself. The whole negotiation with them was avowedly on his own account and for his own benefit, and not for his brother Prentiss.

Did, then, the transaction between the Richardsons and Walker and Fisher create a mortgage in the premises? Some things

are, to my mind, exceedingly clear. In the first place, the deed to Walker and Fisher, and the bond by them to Luther Richardson, are to be treated as part of one and the same transaction. They were, in my judgment, executed at the same time; and if not, at all events they were intended to be contemporaneous in their object and operation. Neither was to be of any force or validity without the other. The bond must have the same precise effect and construction, as if it were inserted in the body of the deed. If, by being so inserted, a mortgage could be created, it was equally created by its being in a separate instrument. In the next place, no consideration whatsoever was paid by Walker and Fisher to Luther or Prentiss Richardson, on account of the deed, at the time of the execution of it, or has been at any time since. It is true, that there is the consideration of the thousand dollars stated in the deed; but it was purely nominal. No person pretends, that that sum, or any other sum was in fact paid, or intended to be paid. If this were the whole case, the deed would be merely voluntary; and the question of a conditional purchase could never arise; for to constitute a conditional purchase, there must be a sale for a valuable consideration between the parties, with a right of repurchase. A mere gift would not raise the question; and, indeed, there is no pretence in the present case to say, that any gift was intended.

What, then, was the real consideration between the parties? To me it appears plain, that there was an agreement by Walker and Fisher, at the request and for the benefit of Luther Richardson, to pay off forthwith the incumbrance of Bennett on the premises, and thereby to save the equity of redemption from being totally extinguished. On the part of Richardson, there was an agreement to convey the premises to Walker and Fisher, to secure the payment of this advance, and all other advances made by them towards the extinguishment of the antecedent mortgages and all expenditures in improvements, with a right reserved to Richardson of reconveyance upon his repayment thereof within five years. This was the basis of the papers actually executed; and the whole transaction would otherwise be without any just aim or object. Bennett's title to the premises would become in a few days absolute, unless he was redeemed. Richardson was, notoriously, unable to redeem from his own funds, and that inability constituted the ground of the application to Walker and Fisher. It would have been the idlest of forms, and the most useless of contrivances, to shift the title from Prentiss Richardson to Walker and Fisher, if it was the design of all parties, that it should perish in the space of twelve days, without any attempt of redemption. The very nature of the transaction demonstrates to my mind, that the redemption of Bennett by Walker and Fisher was the sine quâ non of the whole arrangement. If there could be the slightest doubt upon this head from reading the testimony of Walker and Fisher, it would be entirely removed by the other evidence, and by admitted facts. Bemis says, that about the time the papers were finishing, Bennett passed in the street, and was called in; and Walker and Fisher requested Bemis to ask Bennett to appoint a time, when they should meet him at Billerica, and pay him the money. He did so; and Bennett appointed the time. And on the day so appointed, Walker, and Fisher, and Richardson, and Bemis, met at Billerica, and the money was paid by Walker and Fisher, and the deed was accordingly executed to them by Bennett. This is as pregnant and conclusive a proof of the real nature of the transaction, as can be desired.

Upon this posture of the case, what ground is there to say, that there was a conditional sale of the premises to Walker and Fisher? They paid nothing to Luther Richardson for any transfer of his right to them. They simply paid, at his request, a subsisting debt due from him to Bennett, and took a transfer from Bennett of his interest in the premises. Beyond this they paid nothing; and upon the reimbursement of this and all other advances, on account of the premises, within five years, the premises were to be restored to Richardson. It was in truth but the transfer of a debt from one creditor to another, with the assent of the debtor, expanding the equity to redeem the estate pledged for it from a few days to five years. It has been said, that the true test, whether the conveyance in this case was a mortgage or not, is to ascertain, whether it was a security for the payment of any money or not. I agree to that; and indeed, in all cases the true test, whether a mortgage or not, is, to ascertain, whether the conveyance is a security for the performance or non-performance of any act or thing. If the transaction resolve itself into a security, whatever may be its form, it is in equity a mortgage. If it be not a security then it may be a conditional or an absolute purchase. It is said, that here there was no loan made, or intended to be made, by Walker and Fisher to Richardson; and that they refused to make any loan. There is no magic in words. It is true, that they refused to make a loan to him in money. But they did not refuse to pay for him the amount due to Bennett, and to take the premises as their security for reimbursement within five years. It is said, that there is no covenant on the part of Richardson to repay the money paid, which should be paid by Walker and Fisher to discharge the incumbrances on the premises. But that is by no means necessary in order to constitute a mortgage, or to make the grantor liable for the money. The absence of such a covenant may, in some cases, where the transaction assumes the form of a con-

ditional sale, be important, to ascertain, whether the transaction be a mortgage or not; but of itself it is not decisive. The true question is, whether there is still a debt subsisting between the parties capable of being enforced in any way, in rem or in personam. The doctrine is entirely well settled; and for this purpose it is sufficient to refer to Floyer v. Lavington, 1 P. Wms. 270, 271; King v. King, 3 P. Wms. 360; Longuet v. Scawen, 1 Ves. Sr. 406; Mellor v. Lees, 2 Atk. 496; Goodman v. Grierson, 2 Ball & B. 278; and Conway's Ex'rs v. Alexander, 7 Cranch [11 U. S.] 237,—out of many cases. Now, it seems to me clear, upon admitted principles of law, that, upon the payment of the money due to Bennett by Walker and Fisher, Richardson became their debtor for that amount, as it was paid at his request, and for his benefit. It is a common principle, that if A, at the request of B, pays a debt due by him to C, A may recover the amount in assumpsit for money paid to his use, or for money lent and accommodated. In my judgment, that is the very case at bar. If it should be asked, why no personal obligation was given by Richardson, on this occasion, to pay the money, it might be answered, that the whole circumstances of the present case show an extreme looseness in the transaction of business between the parties; and considering, that much of it was done by the advice and with the assistance of counsel, it is not very creditable to the skill and diligence of the profession. The negotiations between Flagg and Mann and Richardson evince a most obstinate carelessness in the draft and execution of important instruments, leaving much to personal confidence, and the imperfect recollections of the parties, as well as that of the witnesses. And there is no ground for surprise in finding the same laxity pervade the arrangements of Richardson with Walker and Fisher. But the satisfactory answer is, that Richardson was poor and embarrassed, and Walker and Fisher relied on the premises for a full indemnity and satisfaction of all their advances, believing that Richardson would never be able to redeem. They were indifferent about the personal obligation, as they possessed an adequate fund in their own hands.

It is well known, that courts of equity lean against construing contracts of this sort to be conditional sales: and, therefore, unless the transaction be clearly made out to be of that nature, it is always construed to be a mortgage. So Lord Hardwicke laid down the doctrine in Longuet v. Scawen, 1 Ves. Sr. 406, and it has never been departed from. The onus probandi, then, is on the defendants to establish it to be a conditional sale. If it be doubtful, then it must be construed to be a mortgage. If we look to the condition of the bond, it is difficult to resist the impression, that it is precisely in its terms such, as would be appropriate, if the conveyance were a mere mortgage, to secure future advances to be made by Walker and Fisher, in discharge of the incumbrances referred to in the recital. The language of the accompanying lease points to the same conclusion. The dwelling house and garden (a valuable part of the premises) were let to Richardson for five years at a nominal rent; a proceeding not easily reconcilable with the notion of a positive purchase; but quite reconcilable with the notion of a mortgage. That lease contains some language not without significance on this subject. The lease is "for the term of five years from this date, yielding and paying therefor the sum of one cent annually, unless the said premises shall be redeemed by the said Luther, agreeably to the provisions of a bond, bearing even date herewith, from Walker and Fisher to said Luther." I do not lay great stress upon the word, "redeem," in this lease, as conclusive in regard to the understanding of the parties, though it is a word peculiarly appropriate to the case of a mortgage; for it is sometimes used as equivalent to "reconvey." See Lawley v. Hooper, 3 Atk. 278. But, certainly, it is not without weight in a case of this nature; and it was relied on by Lord Hardwicke in Lawley v. Hooper, as indicative of a mortgage. But the fact, that Walker and Fisher were not to go into possession of the entire premises, but that Richardson was to retain the possession of a valuable portion for five years, without payment of any rent, is certainly important. It is remarked by Mr. Butler, in his learned note to Co. Litt. 204b, that the circumstance, that the grantee was not to be let into immediate possession of the estate, affords a presumption of its being a mortgage. It is not unimportant also, that, in the very assignment made of the bond by Richardson to Flagg and Mann, the conveyance to Walker and Fisher is expressly described as a mortgage. And, supposing that assignment to be a valid and subsisting instrument, it is not easy to see, how Mann can now be permitted to set up that conveyance as an absolute estate, to defeat the rights of his co-assignee, he having purchased in the title for his sole account.

But, what strikes me as most material in this case is, the allegation by both Walker and Fisher, in their testimony, that notwithstanding the conveyance to them, they did not contract, and were not bound, to pay off any of the incumbrances. If this were true, there would be an end of treating it, as has been already suggested, as a conditional purchase. I have endeavored to show, that they were positively bound to pay off Bennett's incumbrance. In regard to the antecedent mortgages, they positively deny, that they engaged to pay them off. Now, if this be true, it would be impossible to consider this as a conditional purchase, without the grossest injustice. The purchase would be for little less than a tenth of the value of the property; for Richardson would still be personally bound for the payment of those mortgages.

Nay, he would be bound to pay to Walker and Fisher, as the assignees of those mortgages, and now to Mann, as their assignee, the full amount due on those mortgages, notwithstanding the extinguishment of his title in the premises, by the lapse of the five years. Those mortgages, in their view of the matter, are still subsisting mortgages, capable of being enforced at law, and were not to be extinguished by the purchase and assignment to themselves. So, that if this is admitted to be the true interpretation of the whole arrangement, Walker and Fisher obtained property, confessedly worth, in their own opinion, more than $10,000, by the payment, at most, of the sum of $1,200 only, to Bennett. I have not heard any such doctrine contended for at the argument, although it seems to me a natural consequence from the positions assumed. If the mortgages were not agreed to be extinguished by Walker and Fisher, when they took the conveyance, nothing has since been done by the parties to extinguish them. On the other hand, if that transaction was a mortgage, the whole proceedings are in legal operation, exactly what they should be. The debt to Bennett, and the mortgages constitute a subsisting lien on the premises; and they must be paid by Richardson, before he can claim a reconveyance. Now, it has been well remarked by Mr. Butler, in the note above cited (Co. Litt. 204b, note 1), that if the money paid by the grantee is not a fair price for the absolute purchase of the property conveyed to him, it affords a strong presumption, that the conveyance was a mere mortgage. The same suggestion was pointedly made in Conway's Ex'rs v. Alexander, 7 Cranch [11 U. S.] 241.

On the contrary, if, in opposition to the positive testimony of Walker and Fisher, we are to deem it a part of the agreement at the time of the conveyance to them, that they should pay off the mortgages, having their security for their advances upon the premises, then the same considerations apply to this as to the payment to Bennett. The payments so made were for debts of Richardson, and paid at his request.

I observe, that the assignments of these mortgages to Walker and Fisher speak of the debts as subsisting debts, and the mortgages as liable to be redeemed by Richardson; and Walker and Fisher are authorized to receive the sums due thereon for their own use. But it is said, that it was distinctly understood, that the conveyance should not be a common mortgage; and that the premises should be irredeemable after the five years; and that the shape, which the negotiation took, was for the very purpose of accomplishing this object. Be it so; still if in fact the conveyance was a mere security for advances to be made to Richardson, and the premises were redeemable upon payment of these advances within the five years, in contemplation of law it was a mortgage, whatever name the parties might choose to give to it. Nothing is better settled than the doctrine, that where the conveyance is a mere security, it is a mortgage; and that if it be a mortgage, the parties cannot—by their agreement, that there shall be no equity of redemption after a limited time—change the rights of the mortgagor. The common maxim is, once a mortgage, always a mortgage. The right to redeem is a necessary incident, and cannot be extinguished by a mere covenant, that it shall not be claimed after a limited period. See Goodman v. Grierson, 2 Ball & B. 278; Newcomb v. Bonham, 1 Eq. Cas. Abr. 313, pl. 13; 2 Story, Eq. Jur. § 1019, and authorities there cited; 4 Kent, Comm. (3d Ed.) 142, 143. It seems to me, that the shape of the transaction was merely to evade the principles of law applicable to mortgages. Walker and Fisher were willing to make advances to pay Richardson's debts, and to reinstate him in his equity of redemption. They were willing to give him five years to repay the advances and redeem the estate. But they meant, after that lapse of time, to hold the estate, if unredeemed, by an absolute title. This appears to be the manner in which Bemis understood the transaction; and the only mistake in the matter has been a mistake of law. Luther Richardson's own testimony points still more distinctly to the transaction, as being a mortgage in contemplation of law, whatever might have been the understanding of the parties as to its redeemable quality. The negotiation, according to his statement, began in asking a loan, and ended in an agreement to pay off all the incumbrances, taking the conveyance for the repayment within five years. There is an intrinsic difficulty in treating this transaction as a conditional sale, in whatever manner the circumstances are viewed. It seems to be of the very essence of a sale, that there should be a fixed price for the purchase. The language of the civil law on this subject is the language of common sense. "Pretium autem constitui oportet; nam nulla emptio sine pretio esse potest," say the Institutes. Inst. lib. 3, tit. 24. Ulpian, in the Digest, repeats the same suggestion; "Sine pretio nulla venditio est." Dig. lib. 18, tit. 1, c. 2. Now, here is not the slightest proof, in this case, of any sum being agreed on as the price of the purchase. No money was in fact paid; and if Walker and Fisher are to be relied on, none was contracted to be paid; and even the incumbrances were not to be discharged. The money, which was to be repaid on the reconveyance, was only what had been, in the intermediate time, actually paid to discharge the incumbrances, and expended in improvements. If none had been so paid, none was to be repaid. So that not only was there no fixed price; but the premises stood as a mere security for future advances.

Hitherto the case has been considered, upon the question of mortgage or not, upon the footing not merely of the conveyance and

bond, but of the parol evidence admitted as explanatory of the intent of the parties. It has been suggested, however, on behalf of the plaintiff, that as the papers, upon their face, taken together, do actually import a mortgage, it is not competent to admit parol evidence to control their legal effect. There is weight in the objection; for, in my judgment, the papers, taken together, do distinctly proclaim the case to be a present mortgage for future advances. But it is unnecessary to consider this objection, as the same conclusion is arrived at upon·a full survey of all the parol evidence and circumstances attendant upon the transaction.

It remains to notice another argument, which has been brought forward to prevent the conclusion, that the conveyance is a mortgage. The argument is, that the bond is not between the same parties as the conveyance. The conveyance was by Prentiss and Luther Richardson, and the bond to Luther only; so that it cannot operate as a defeasance; for (it is said) a defeasance must be between the same parties as the deed, which it is to defeat. It does not seem to me, that the question of mortgage or not depends in this case at all upon the point, whether the bond was a technical defeasance or not. There may be a defeasance of a deed of conveyance, which at the same time will not make it a mortgage. On the other hand, there may be a mortgage, although the attendant bond does not technically constitute a defeasance. If the conveyance in the present case had been confessedly a security for a loan, there could be no doubt, that in a court of equity it would have been deemed a mortgage, whatever might be the case at law, though I am not satisfied, that it would have made any difference at law. A court of equity would wholly disregard the form of the transaction, and look to the substance. But the truth is, that, even if the bond had been between the same parties as the conveyance, it would not have constituted a defeasance of the conveyance, technically so called. Lord Coke has given a very correct definition of a defeasance in stating its derivation. It is, says he (Co. Litt. 236b), fetched from the French word, "defaire," i. e. to defeat or undo, "infectum redere quod factum." The true meaning of this language is, that it is to make void the principal deed. Lord Chief Baron Comyns (Com. Dig. "Defeasance," A) says; a defeasance is an instrument, which defeats the force or operation of some other deed or estate; and, that, which in the same deed is called a condition, in another deed is a defeasance. Sheppard, in his Touchstone (page 396), is still more direct. He says; a defeasance is a condition relating to a deed, as to an obligation, &c., which, being performed by the obligor, &c., the act is disabled and made void, as if it had never been done; which

differeth only from a condition in this, that this is always made at the same time, and annexed to, or inserted in the same deed. But that is always made in a deed by itself. Mr. Justice Blackstone (2 Bl. Comm. 327, 342) gives the same definition. A defeasance (says he) is a collateral deed, made at the same time with a feoffment, or other conveyance, containing certain conditions, upon the performance of which the estate then created may be defeated or totally undone. So that it is of the very essence of a defeasance, technically so called, that it defeats the principal deed and makes it void ab initio, if the condition is performed. See Mr. Sergeant Williams' note to Fowell v. Forrest, 2 Saund. 47n. note 1. The very distinction was taken, and acted on in Lacy v. Kynaston, 2 Salk. 575, 1 Ld. Raym. 688, 690. The present bond does not declare, that, if the condition is complied with the conveyance shall be utterly void. On the contrary, it is to remain in full validity, and a reconveyance of the title is to be made, which necessarily supposes, that, until the reconveyance, the estate remains at law in the grantees. See Erskine v. Townsend, 2 Mass. 497. Yet no one will for a moment doubt, that it makes no difference as to the question of mortgage, either at law or in equity, whether the condition be, that upon the payment of the money loaned the condition is to reconvey, or that the principal deed is to be void and of no effect. If there could be a doubt, the case of Manlove v. Bale, 2 Vern. 84, 1 Eq. Cas. Abr. 313, and Erskine v. Townsend, 2 Mass. 403, would completely overthrow it.

It is very clear in this case, that the parties did not contemplate, that the bond to be given should operate as a defeasance; for if it had been so to operate, and the condition had been strictly performed, the estate would have been revested in Prentiss Richardson, and would not have vested in Luther Richardson, contrary to the manifest intention of the parties. The bond was therefore to reconvey to Luther; ·and in no sense was it a defeasance of the conveyance. But mortgage or not can never depend upon the single point, whether the instrument is a defeasance or not. If a mortgagee were to covenant in the mortgage deed, that, upon payment of the mortgage money, he would reconvey to the mortgagor, it would clearly be a mortgage.[2] If, instead of that, he were to covenant to convey it to such other person, as the mortgagor should appoint, it would not the less be a mortgage. Take the case of a clear trust estate, where the cestui que trust borrows money on a mortgage of the estate, and both the trustee and cestui que trust join in the mortgage conveyance; and the covenant is to reconvey to the trustee, upon the payment of the money by the cestui

---

[2] The case of Erskine v. Townsend, 2 Mass. 497, is directly in point.

que trust, it would plainly make no difference, as to its being a mortgage, that the payment was not to be made by the trustee, although the reconveyance was to be to him. The conveyance would still be but a security for a loan; and that is the true test of a mortgage. The same result would arise, if the payment was to be made by the cestui que trust, and the reconveyance was also to be made to the cestui que trust, which I conceive to be the very case at bar. Mr. Preston, in his learned work on Conveyancing (volume 2, pp. 201, 202), has put several cases of mortgages of this nature, where the redemption is to be by the beneficial owner alone, although the conveyance is jointly made by him and another person as the formal legal owner, without the slightest intimation of its not being an inappropriate mode of creating a mortgage. In my view of the matter, then, it is of no consequence, that the reconveyance was to Luther Richardson alone. Nor is it necessary to decide, whether the doctrine is universally true, as laid down in Sheppard's Touchstone (page 397), that to make a deed a technical defeasance, it should be between all the same persons, who were parties to the first deed. A bond, given to a mere stranger to the original deed, certainly ought not to be construed as a defeasance. But a bond given by the grantee to one of the grantors of a deed to defeat and make void the conveyance, if executed at the same time with the conveyance, may possibly (for I do not mean to express more than a doubt) admit of a different consideration.

Upon the whole, without going more at large into this point, though there are many things, which might afford grounds for additional comments, my opinion is, that the conveyance to Walker and Fisher, connected with the bond and other transactions, was a mere mortgage or security for the advances to be made by Walker and Fisher, and not a conditional purchase by them of the estate. In cases of this sort, it is of very little consequence, what the particular language used by the parties is, whether they speak of a loan, or of a purchase, of a mortgage, or of a conditional sale. Courts of equity look to the real nature of the transaction, stripped of all the disguises, which the parties may have thrown around it. My opinion also is, that Luther Richardson had a clear equity of redemption in the premises at the time of his conveyance to Flagg and Mann, sufficient, in a court of equity at least, to make them tenants in common in equity. I do not say, that the equity was such, as would make them tenants in common of an estate at law. It is sufficient for me to say, that they are so of an estate in equity. The great difficulty, which I have felt in arriving at this conclusion, has arisen from the decision of the supreme court of the state. in the case of Flagg v. Mann, 14 Pick. 467. That case was finally

decided upon a mere question of the jurisdiction of the court, under the Massachusetts statute of 1823 (chapter 140, § 2). The court held, that the plaintiff and defendant were not tenants in common of the premises in the sense of that statute, and therefore, that the bill was not maintainable. I have not the slightest disposition to question the correctness of that decision; and, as a point of local law, I should feel myself bound by it. My distress has been with the other views suggested in the very able opinion delivered on behalf of the court on that occasion. It is true, that these views, not being founded upon local law, but upon general principles of interpretation applicable to courts of equity, are not, and cannot from their nature be, conclusive upon this court, in a suit in equity addressed to its general jurisdiction. Still, however, it is impossible not to feel the just weight of that opinion upon every point in litigation in the present cause; and that, if that opinion be correct, the conveyance to Walker and Fisher was not a mortgage, and that nothing passed by the subsequent conveyance from Luther Richardson to Flagg and Mann. After a careful survey, however, of the whole case, as now presented to this court, I have been unable to arrive at the same conclusion. This is to me matter of regret; but judicially I am compelled to follow on this occasion the results of my own judgment.

The other point, however, suggested at the argument by the plaintiff's counsel, is not undeserving of notice. It is, that even if no title in the premises did pass by the deed of Luther Richardson to Flagg and Mann; yet, nevertheless, there was a color of title in him at the time, and that the deed itself, being accepted by Flagg and Mann, and an assignment being taken and notes given, under and in virtue of the parol agreement between them, for the joint purchase from Richardson, these facts did of themselves create a privity of claim and right in the premises. sufficient to establish a fiduciary relation between them. And if such a fiduciary relation actually did exist. then the purchase of Mann. from Walker and Fisher and from the Frye heirs must be treated in equity as a purchase for the joint account of Flagg and Mann. There is great force in this argument; and I am not prepared to say, that it is not well founded.

In the first place, it seems to me clear, that if there had been a written agreement between Flagg and Mann to make the purchase from Richardson, and the purchase had been executed accordingly, while that contract and purchase remained unrescinded, it would have created a privity of contract between them, which would establish a fiduciary relation for all purposes connected with the premises, whatever might be the state of the title. I do not mean here to rely on the doctrine of estoppel, result-

ing from the joint conveyance to them from Richardson, for I agree with the supreme court of the state in thinking, that there was no such legal estoppel. See Flagg v. Mann, 14 Pick. 481; Blight's Lessee v. Rochester, 7 Wheat. [20 U. S.] 535. But I proceed upon this, that a written contract to purchase an estate upon joint account does create a fiduciary relation between the parties, as upon a mutual agency for the purposes of the contract, which neither is at liberty to defeat by a purchase on his sole account. It appears to me, that Forster v. Hale, 3 Ves. 696 (same case, on appeal, 5 Ves. 308), fully supports this doctrine; for in that case the purchase was by one partner of a banking-house of a quarter part of a colliery, and the other partners insisted, that it was a purchase in trust on joint account. And they prevailed, upon the mere proof from subsequent letters of that partner, that the purchase was a trust. There was no pretence to say, that there was any title vested in the partnership in the colliery, or that it had been paid for out of the partnership funds. The whole rested upon a fiduciary relation created by privity of contract, established in writing between the parties. In the present case, it seems to me, that although the agreement was by parol, yet having been fully executed by the passing of the deed and assignment and note between the parties, the trust is fully established, so as to extract it from the statute of frauds. If, then, there was, upon the mere privity of a contract executed between the parties, a fiduciary relation created between Flagg and Mann, that relation, in my judgment, was sufficient to make the subsequent purchase from the Frye heirs and from Walker and Fisher a purchase for the joint benefit, independently of the point, whether an actual title in the premises under Richardson was then vested in Flagg and Mann. I do not mean to deny the doctrine, stated at the bar, that a parol agreement by two to purchase lands will not create joint interest by way of trust, if the purchase is made by one in his own name. The authorities are not entirely agreed upon this point, though the weight of opinion may, perhaps, be, that such a case is within the statute of frauds. The case of Riddle v. Emerson, 1 Vern. 108, 1 Eq. Cas. Abr. 381, rather leans the other way. Lamas v. Bayly, 2 Vern. 627, is more direct in favor of the doctrine; though, upon examining the decree in the register's book, it appears, that the lord chancellor rather proceeded upon the circumstances of the case being too slight to found a decree. Raithby's note 1. Id. Atkins v. Rowe, Mos. 39, is directly against it. On the other hand, Bartlett v. Pickersgill, 1 Eden, 515, 4 East, 577, note b, supports it. In this last case, the lord chancellor said, that, if there had been any fraud used by the defendant to prevent an execution of the agreement, it might have been otherwise. Now, if, by the

agreement between Flagg and Mann to purchase from the Frye heirs, Flagg was purposely lulled into a false security, relying, on the good faith of Mann, and his privity in interest under the purchase from Richardson, and the negotiation of Mann was designedly kept secret from Flagg, in order to prevent any active competition on his part, there might be great reason for the application of this principle upon the ground of a constructive fraud. However this may be, I do not mean, in the present case, to rely upon any fiduciary relation arising from privity of contract, but upon a fiduciary relation arising from privity of title and estate between Flagg and Mann. In this view of the case, the purchase made directly by Mann of Walker and Fisher, and also the purchase made through Adams of the Frye heirs, must be deemed, so far as Mann is concerned, as made on the joint account of Flagg and himself. But Mann has parted with his whole title in the premises to other persons, to wit, one moiety thereof by his deed to Adams, and the other moiety thereof by his deed to Fuller; and if they are to be deemed, in the sense of a court of equity, bonâ fide purchasers for a valuable consideration without notice of Flagg's title, then they are entitled to hold the premises discharged of all claims of Flagg, except so far as may extend to any unpaid purchase-money. In regard to Adams, there is no unpaid purchase-money; for the conveyance made to him was in consideration of a contemporaneous conveyance by him to Mann of an undivided moiety of another tract of land held by Adams under a title from one Josiah Wood, Jr. In regard to Fuller, there is a considerable portion of the purchase-money still unpaid. Fuller, also, by the same deed, took a conveyance of the undivided moiety in the other tract, which had been conveyed by Adams to Mann.

Now, under these circumstances, there are various questions, which arise for our consideration. In the first place, as Mann was clearly entitled to a moiety of the premises (supposing it to be a joint purchase for himself and Flagg,) he had a right to sell that moiety to whomsoever he might choose, and the sale would be no disturbance of Flagg's rights. And, under such circumstances, notice by the purchaser of Flagg's right would not in the slightest degree affect his own title. Mann has conveyed the whole of the premises by different deeds; one moiety to Adams, and one moiety to Fuller. And the question, which meets us, is, whether Adams and Fuller are to be considered as each taking a moiety of the moiety, which Mann had a right to convey, of the premises; or whether, Adams's deed having been executed on the 6th of August, 1831, two days at least before the date of that of Fuller, he is not entitled to hold the entire moiety conveyed by the deed to him by Mann. My opinion is, that the latter

is his true predicament. At the time when Mann conveyed the moiety to him, he had a perfect title thereto; and his deed took full effect. And where a rightful estate is claimed by each of two purchasers, whose titles in other respects are equal (and Adams's deed was recorded on the 8th of August, three days before that to Fuller), the maxim prevails, "Qui prior est in tempore, potior est in jure." In this view of the matter, the question of notice to Adams becomes wholly unimportant; for, notice or no notice, his title is equally protected in law and in equity.

In regard to Fuller, in the next place, there are various questions presented upon the record, and made at the argument. (1) The first is, whether he had, at the time of his purchase, notice of Flagg's title. (2) Another is, whether, if he had no notice, his title is of such a nature (being by mere release) as entitles him to the protection of a bonâ fide purchaser for a valuable consideration in a court of equity. (3) Another is, whether, if he is so entitled, he is not still liable, as to the unpaid purchase-money, to the plaintiff's equity, as a lien attaching thereto. (4) Another is, whether the plaintiff has not, by his own conduct, either ratified the sale to Fuller, or at least disabled himself from now contesting it.

First; as to the question of notice. And here it is material to consider, that notice to affect Fuller must be notice of the title of Flagg under the joint purchase from Richardson; and also notice of the interest asserted by Flagg, as a trust, under the purchase by Mann from Walker and Fisher, and from the Frye heirs. The former is mainly dependent upon written documents; the latter is dependent upon mere oral agreements between the parties, and is properly a result arising by construction of law. I agree also to the criticism suggested at the bar, that it was not a wrongful act on the part of Mann to take the title from Walker and Fisher and from the Frye heirs in his own name; as it was his only security, either to compel Flagg to abandon those purchases, or, if he insisted on his share, to compel him to repay the advances made by Mann. Now, in regard to the joint purchase from Richardson, it is to be observed, that not a scrip of paper was to be found on record respecting it until the 15th of February, 1832. Until that time, no registration was made of the deed of Richardson to Flagg and Mann, or of the bond of Walker and Fisher to Richardson, or of the assignment of that bond to Flagg and Mann; and then the registration, it seems, was made by Flagg. So that there was no pretence of notice to Fuller at the time of his purchase in the preceding August by any registration. The whole title to the premises, so far as any search in the registry would disclose it, was in Walker and Fisher; or, if the guardianship deed was invalid, was in the Frye heirs. Mann was the purchaser from both; and his title was, therefore, as that of the sole legal owner, unexceptionable, unless notice of the trust in favor of Flagg is brought home to Fuller at the time of his purchase from Mann. In examining the charges of notice in the bill against Fuller, it must be admitted, that they are very loose and indeterminate, and hardly such as would stand the scrutiny of a court of equity, upon a demurrer for that cause. The first is a mere general charge, that "the said Fuller, then well knowing all and singular the premises." The next is, that "Fuller had some notice or intimation, or some reason to suspect and believe, that the said Luther Richardson, before the conveyance aforesaid to your orator and said Mann, had some interest or claim to said lands; and that such conveyance had been made to and such agreement had been made between your orator and the said Mann as aforesaid, and that your orator claimed to have some interest in the premises." It seems to me, that a charge so very loose and indeterminate, amounting to a mere intimation, or suspicion, or belief of the defendant, of some claim or interest of the plaintiff, is not such a charge of notice, as is required in cases of this sort. On the contrary, there should be a clear and positive allegation of full notice of the very title and claim of the plaintiff asserted in the bill, so that the defendant may know, with certainty and distinctness, to what he is to answer. The subsequent specifications are open to the like objection. They are too loose and too general in their structure. But it is unnecessary to dwell on this infirmity in the allegations of the bill, because Fuller has, in the most direct and positive manner, denied having had any notice of Flagg's claim and title, or any intimation, suspicion, or reason to suspect or believe in his claim or title at the time of his purchase, or until long afterwards. And in the same explicit manner, he denies all the specifications tending to establish notice, which are asserted in the bill.

Now, upon this posture of the case, it is plain, that these strong and direct denials being responsive to the bill, are conclusive in favor of Fuller, unless they are overcome by very direct and satisfactory evidence on the other side. It is a well-known rule in equity, that, to overcome the positive denials of an answer, responsive to the charges in a bill, there should be the testimony of two witnesses of equal credibility on the other side, or of one witness with strong and stringent circumstances. The question then is, whether such testimony exists in this case? My opinion is, that it does not. I dismiss at once all the suggestions in relation to the rumors, as well as the notoriety, of the supposed purchase of Richardson in Lowell, because they do not bring home to Fuller any presumptions of notice. He did not live at Lowell at the time of the purchase; and if he had lived there, the recollections of the witnesses, as to the exact times of those rumors and of

that notoriety (so vitally important in this case), are far too loose to found any confidence in their statements. Indeed, most of the plaintiff's witnesses on this point pretend to no exactness as to times; and this leads me ·to some distrust of the memory of those, who are more direct in their statements. In its very nature, such evidence, as to times and dates, is open to much question, unless it stands supported by particular fixed facts, to which it may with certainty be referred. Vague reports and rumors from strangers are not a sufficient foundation, on which to charge a purchaser with notice of a title in a third person. See Sugd. Vend. (7th Ed.) c. 17, p. 730; Hewes v. Wiswell, 8 Greenl. 98. And I think, that Lord Hardwicke stated the true doctrine, when, in Hine v. Dodd, 2 Atk. 276, he said that there ought to be a clear, undoubted notice; and that suspicion of notice, though a strong suspicion, is not sufficient to justify the court in breaking in upon an act of parliament; or (as I would add) upon the legal rights of a purchaser.

As to the presumption of notice from the fact, that Mann and Adams and Fuller boarded together in the same house in the summer of 1831, it is impossible to rely upon it without violating the first principles of evidence. Men often board together for a long time in the same house, without any knowledge of each other's business. And there is not the slightest proof, that Fuller ever held any conversations on the subject of the title of Flagg with either Mann or Adams. On the contrary, all three of them expressly deny any such conversations.

As to the particular notice charged upon Fuller by the testimony of Howard, and Wood, and Hobbs, it does not in my judgment outweigh the positive denials of the answer. I cannot but think, that Howard is under some mistake in the matter; for. if the other testimony in the case, even that on the side of the plaintiff, is to be believed, it is impossible, that the title of Richardson, purchased by Flagg and Mann, could, in May or June, 1831, have been treated by any persons, as certain in itself, so as to justify the expression, that they had made a fortune by it; for there was at that time a double cloud upon the purchase, viz. that of the title of Walker and Fisher. and that of the Frye heirs, which must have been quite as notorious as the purchase itself. Besides; if we are to credit Wood's testimony, Fuller's own opinion, as expressed to him, was adverse to the notion, that the conveyance to Walker and Fisher was a mortgage; and, therefore, he could hardly have congratulated Flagg upon having made a fortune by such a purchase. As to Wood's testimony respecting the conversation, which he had with Fuller at Concord, admitting its entire credibility, it does not reach the point, which is indispensable to establish notice of Flagg's title. Nothing appears to have been said about Flagg in the course of the conversation. The sole question was as to Walker and Fisher's title, whether it was a mortgage or not; and to this extent and this extent only it brings home notice to Fuller. But it must also be taken into consideration, that Fuller, in his answer, while he admits the conversation with Wood, utterly denies, that any names were mentioned. He says. that the conversation was very short; that Wood asked his opinion "as to a question of law, which question was stated by Wood in abstract terms, without any names, application, or any intimation, that .any such case actually existed; and on said Wood's statement said Fuller gave his opinion readily, that a bond, under the circumstances enumerated by said Wood, could not create a right to redeem in the obligee, such as existed in a mortgagor under a mortgage." So that here there is only one witness at most against the answer, which is directly responsive to a charge in the bill. Then as to the testimony of Hobbs. He speaks to a conversation in a stage coach in August, 1831. between himself and Fuller, Flagg, the plaintiff, being present, as follows: "I asked said Fuller, if the title of said Richardson (to the Paddy Camp lands) was good; and he replied that the title was good for nothing, because the bond of Walker and Fisher to Luther Richardson was not recorded. Said Fuller referred, as I suppose, to a bond, which had been executed by said Fisher and Walker, conditioned to convey said lands to said Richardson on the payment of a certain sum of money." He adds, that although Flagg was present, "Flagg did not take any part in the conversation; and I do not recollect any thing farther, that was said by said Fuller or myself as to the said lands or the title to them." Now, it is not a little remarkable, that the witness says, that he does not recollect, what day of the month of August it was, so that it is impossible to say, whether it was before or after Fuller's purchase; and yet it is brought forward as evidence of notice to him before his purchase; and, what is yet more remarkable, Flagg said not one word of his own title to the premises on that occasion; but he was studiously silent. Why was this silence? Why did he not proclaim his title at this time to Fuller, and insist on his rights? Fuller, in his answer insists, that this conversation was long after his purchase; and he adds. that at that time he had never heard, that the bond had been assigned to Flagg and Mann. And here, again, his answer is responsive to the charge in the bill. It is plain, therefore, that the special notice of Flagg's title. charged upon Fuller, is not established by the testimony of these witnesses in a clear and unquestionable form. And I cannot but think the doctrine of Lord Hardwicke in Hine v. Dodd, 2 Atk. 275, which was so fully ap-

proved in Jolland v. Stainbridge, 3 Ves. 478, and Eyre v. Dolphin, 2 Ball & B. 301, and was acted upon by the supreme court of New York (Jackson v. Given, 8 Johns. 105, 107), affords a very important lesson to all judges not to place much reliance upon the testimony of loose conversations or confessions of the party to overbalance his solemn denial of notice on oath in his answer. See, also, Butcher v. Stapely, 1 Vern. 363; Sugd. Vend. (7th Ed.) 730; Pow. Mortg. (by Coventry & Rand) 562, note. So far then as the point of actual notice is concerned, it fails.

We are next led to the consideration of the question of constructive notice. In the first place, it is said, that Mann, Adams and Fuller had a joint interest in the purchases from Walker and Fisher, and from the Frye heirs; and that Mann was the agent of the others in making the purchases, and the knowledge of the agent is in contemplation of law the knowledge of his principals. Admitting the operation of this principle in its full extent, it does not seem to me applicable to the circumstances of the present case. In regard to Adams, it may well be doubted, whether Mann was his agent except for the purchase of the title of the Frye heirs to the estate held by Wood; and that is not in controversy in the present suit. In regard to Fuller, there is no evidence whatsoever, which shows, that he ever had a joint interest in the original purchase from the Frye heirs, or from Walker and Fisher. On the contrary the whole evidence satisfactorily establishes to my mind, that he was a subsequent sub-purchaser.

Then, again, it is said, that Richardson was in possession of the premises or of a part thereof at the time of the purchase by Fuller, which operated as constructive notice of Richardson's title. I admit, that the rule in equity seems to be that, where a tenant or other person is in possession of the estate at the time of the purchase, the purchaser is put upon inquiry as to his title; and if he does not inquire, he is bound in the same manner, as if he had inquired, and had positive notice of the title of the party in possession. The cases cited by Mr. Sugden in his able work on Vendors and Purchasers (chapter 17, pp. 743–748, 7th Ed. 1826), and by my learned friend, Mr. Chancellor Kent, in his Commentaries (4 Kent, Comm. 3d Ed. 179, 180), are full to the purpose. See, also, Daniels v. Davison, 16 Ves. 249, 17 Ves. 433; Taylor v. Stibbert, 2 Ves. Jr. 440; Hall v. Smith, 14 Ves. 426; Meux v. Maltby. 2 Swanst. 281; Allen v. Anthony, 1 Mer. 282; Eyre v. Dolphin, 2 Ball & B. 301; Powell v. Dillon, Id. 416, 421, and cases there cited; Crofton v. Ormsby, 2 Schoales & L. 595; 4 Kent, Comm. (3d Ed.) 179, 180. But constructive notice of this sort does not extend beyond the title of the party in possession; and the purchaser is not ordinarily bound to know, or presumed to have notice

of the title, under which the party in possession claims or derives his own title. That seems fairly inferrible from the language of Lord Eldon in Attorney General v. Backhouse, 17 Ves. 293; and is stated in the broadest terms by Mr. Sugden, in the work above cited (pages 745, 746): "Notice" (says he) "of a tenancy, will not, it seems, affect a purchaser with constructive notice of the lessor's title. Therefore, if a person equitably entitled to an estate let it to a tenant, who takes possession, and then the person, having the legal estate, sells to a person, who purchases bonâ fide and without notice of the equitable claim, the purchaser must hold against the equitable owner, although he had notice of the tenant being in possession." It is true, that the learned author quotes no authority for this position; but his own great experience and acknowledged ability are a sufficient guaranty, that it is well founded. It would be pushing the doctrine of constructive notice to a great degree of extravagance to hold, that the purchaser was bound to know not only the title of the party in possession, but all its derivative sources. Indeed, the American courts seem indisposed to give effect to this doctrine of constructive notice from possession, even in its most limited form. Thus, in Scott v. Gallagher, 14 Serg. & R. 333, the court held, that the possession of a cestui que trust, and the exercise by him of acts of ownership, were not constructive notice to a purchaser of the legal title from the trustee; but that there should be direct, express and positive notice of the trust. This doctrine was probably enforced by considerations growing out of our registration acts, which are designed, and with great justice, to protect purchasers against latent equities. In McMechan v. Griffing. 3 Pick. 149, the court held, that possession of the premises was not, under all the circumstances, constructive notice of the title of the party in possession; that it is not sufficient, that the inference of notice from the circumstances is probable; but it must be necessary and unquestionable. The case of a purchase in fee by, a lessee in possession is there put as one, in which no constructive notice of that purchase would be imputed to a subsequent purchaser. It is difficult to reconcile this with what is laid down in Daniels v. Davison, 16 Ves. 249, and many other cases.[3] In Newhall v. Pierce, 5 Pick. 450, it was held, that the single fact, that the grantor was in possession, would not justify the inference, that an attaching creditor had constructive notice, that the grantor remained in possession under his

[3] See Sugd. Vend. (7th Ed.) p. 744. c. 17. and cases there cited, and the cases cited in Powell v. Dillon, 2 Ball & B. 421. note. a. The whole subject of notice is examined and exhausted in the notes of the learned editors, Mr. Coventry and Mr. Rand, to Powell Mortg. pp. 562–662, c. 14: Meux v. Maltby, 2 Swanst. 281; Allen v. Anthony. 1 Mer. 282; Grimstone v. Carter, 3 Paige, 436, 437.

original title, as mortgagor. In Hewes v. Wiswell, 8 Greenl. 94, the whole subject is discussed with great ability, and the conclusion arrived at, that, at most, possession is merely implied notice, which may be rebutted, and in this respect differs from constructive notice, which cannot be rebutted. See Lord Chief Baron Eyre's opinion in Plumb v. Fluitt, 2 Anstr. 438. These cases do, as I think, admonish courts of equity in this country, where the registration of deeds, as matters of title, is universally provided for, not to enlarge the doctrine of constructive notice, or to follow all the English cases on this subject, except with a cautious attention to their just application to the circumstances of our country, and to the structure of our laws. Indeed, even in England, if we may trust to the report of the case Oxwith v. Plummer, as reported in Bacon's Abridgment (Bac. Abr. "Mortgage," E, § 3), and relied on by Mr. Sugden (Sugd. Vend. 7th Ed. p. 746, c. 17), the mere circumstance, that the vendor had been long out of possession, and a party in possession under a covenant from him to convey the title, would not be constructive notice to a subsequent purchaser from the vendor. But assuming, that the possession of Richardson was constructive notice to Fuller of his title in the premises, it was notice only of his actual title, which was that of a tenant at sufferance under Walker and Fisher; and was in no just sense notice of the conveyance of Richardson to Flagg and Mann.

Then, again, it is further argued, that Fuller cannot be treated as a bonâ fide purchaser for a valuable consideration without notice, because, at the time of the conveyance by Mann to him, Mann was not seized, and did not pretend to be seized in fee of the premises, nor was he ever in possession thereof, nor did he pretend to any title in the premises; for the deed of Walker and Fisher was then a mere escrow, Mann being at liberty to receive or reject it within thirty days from its date (the 27th of July, 1831). There is no doubt of the general doctrine, that in a plea of a purchase for a valuable consideration, without notice of the plaintiff's title, it is necessary to aver, that the person, who conveyed, was seized, or pretended to be seized, at the time that he executed the purchase deed. That was held by Lord Hardwicke in Story v. Lord Windsor, 2 Atk. 630, and it has been fully recognised down to the present time. See Sugd. Vend. (7th Ed.) p. 757, c. 18. The cases of Wallwyn v. Lee, 9 Ves. 24; Daniels v. Davison, 16 Ves. 252; and Jackson v. Rowe, 4 Russ. 523,—insist, that it should also aver a possession in the vendor. But this proposition must be received with a qualification given to it by Lord Redesdale, that the conveyance purports to be an immediate transfer of the possession at the time of its execution. Mitf. Eq. Pl. (by Jeremy) 275. And indeed possession of a tenant is possession of his landlord within the meaning of the rule, as was said by Lord Eldon in Daniels v. Davison, 16 Ves. 252. But the doctrine, here insisted on, is strictly applicable only to a plea technically so called; and I cannot but think, that it is properly applicable only to cases, where such want of seisin or possession affords presumptive evidence of a defect of title in the grantor to make the grant sufficient to put the purchaser upon inquiry. See Beames, Pl. Eq. 235. But, be this as it may, here the whole merits of Fuller's title are laid open upon his answer. The true question, in all cases of this sort, where the purchaser, in his answer, insists upon the defence of his being a bonâ fide purchaser without notice, is, whether he has acted with good faith, and purchased under circumstances of an apparent right in the vendor to convey. Now, upon the reasoning and circumstances already suggested, Fuller, at the time of his purchase, had no actual or constructive notice of the title of Flagg. The question is, whether he had any notice of any defect in the title of Mann, at the time of the conveyance to him, viz. on the 8th of August, 1831. It is very clear, that Mann asserted, that he then had a complete and perfect title to convey the premises to Fuller; and Fuller paid a very large and apparently full consideration for the purchase of a good title. It is true, that, in a technical sense, Mann had not a complete and entire seisin of the premises at that time under Walker and Fisher, if their deed was then an escrow, though he was entitled thereto at his own absolute option, at any time within the thirty days. The title of the Frye heirs, however, if they had any, was actually vested in him by the deed of Adams to him. And against all the world, except Flagg, the very allegations of the bill admit, that he had a good title. But it appears to me by no means clear upon the bill and answer, that at the time of the conveyance to Fuller, there had not been an absolute delivery of the deed of Walker and Fisher to Mann. The bill explicitly states, that Walker and Fisher did actually convey their title to the premises to Mann by their deed on or about the 27th of July, 1831. The answer of Mann says, that it was an escrow at that time; but that it was actually delivered to him on or about the 8th of August, 1831. But there cannot be a reasonable doubt, that he did then affirm to Fuller, that he was then in the actual seisin of the premises, and that he had a complete title thereto; and that Fuller purchased, trusting to the good faith of Mann In point of fact, the possession of Richardson was a possession as a tenant at sufferance, under Walker and Fisher, and not adverse to them; and on the 10th of August, 1831, there was an admitted perfect title in Mann to convey the premises against everybody but Flagg. Let us put the question, then, whether, setting aside the claim of Flagg—a claim secret and unknown to Fuller—the latter is not absolutely bound by his purchase? Could Fuller, either in law, or in equity, now set

up the defence, that Mann's conveyance to him was void and inoperative, by reason of the possession of Richardson, or the title of Walker and Fisher being outstanding upon an escrow, when the conveyance was made to him? I think not; and if so, then it seems to me, that he has a right to insist, that he is, under all the circumstances, to be treated as a purchaser for a valuable consideration without notice, because Mann undertook to convey, and did convey to him, all the title of Walker and Fisher, and of the Frye heirs, in the premises. The seisin of Walker and Fisher, and the possession of their tenant, Richardson, was, if their deed was at the time a mere escrow, a seisin for the benefit of Mann under his contract with them. If a cestui que trust in fee conveys the estate to a purchaser, and the trustee afterwards confirms the sale, and releases to the cestui que trust, or to the purchaser, it seems to me, that such a purchaser is entitled to protection, against any antecedent secret trust, which is unknown to him at the time of the purchase, and the confirmation is operative, notwithstanding, that in a strict sense the cestui que trust was not seised of the estate at the time of his conveyance. But the present case is far stronger; for the title of Fuller was complete, by an absolute delivery of the deed by Walker and Fisher to Mann, on or before the 10th of August, 1831; and there is not, in my judgment, any sufficient proof whatsoever, that, between the 8th and 10th of August, 1831, nor indeed until long afterwards, Fuller had any notice of Flagg's title. After the 10th of August, Fuller was clothed with a complete legal title, and a subsequent notice ought not to affect him. It does not appear to me, therefore, that this objection ought to prevail against Fuller's title.

And this leads me, in the next place, to the consideration, whether Fuller's title, being by a mere deed of release, is such a conveyance as entitles him to the benefit of the plea of a bonâ fide purchaser without notice. This is a point, upon which I have felt very great difficulty; and it was suggested, at the argument, as matter of grave consideration. If the language of the deed had been, that Mann merely released to Fuller all his right, title, and interest in the premises, there might, perhaps, have been more difficulty to found the defence; for then it might, under such circumstances, be construed to convey no more than Mann could rightfully convey, and that the purchaser should take at his peril, subject to all the rights and equities of third persons in the premises. But, here, the language of the deed is, that Mann, in consideration of $40,-000, does "remise, release, and for ever quit-claim unto the said Elisha Fuller, his heirs and assigns, one undivided half of a certain tract of land," &c. (describing it) to have and to hold to Fuller, so that neither Mann nor his heirs, nor any other person claiming from or under him, shall have, claim, or demand any right or title to the premises. If this deed were to be construed as a mere release, the objection taken to it at the bar would be well founded; that, as the releasee was not in possession, it was a void conveyance. But we all know, that this is a common mode of conveyance in Massachusetts; and that, where it is for a valuable consideration, "ut res magis valeat quam pereat," a deed of release has been construed to be a bargain and sale, or other lawful conveyance, by which the estate might pass. It was so decided in Pray v. Peirce, 7 Mass. 381; and it was still more elaborately examined and solemnly adjudged in Russell v. Coffin, 8 Pick. 143, 151–154. And indeed, it is but an expansion of the principle laid down in Sheppard's Touchstone (page 82) "that a deed, that is intended and made for one purpose, may enure to another; for if it will not take effect that way, that is intended, it may take effect another way." I am not aware, that a purchase by way of a mere release, like the present, has ever been set up in England as a defence in a case of this sort. The researches of counsel have not discovered any such case; and I am much inclined to believe, that none exists. Still, however, it is not absolutely incompatible with the nature of a release, where, by reason of a privity of estate between the parties, it operates by way of enlarging the estate of the releasee, or of passing the estate of releasor, that it should be a sufficient foundation, if bonâ fide made, for a valuable consideration, and without notice, to support the defence. There may be a difference, where the release is to operate, merely by way of passing a right, or by way of extinguishment. See the different kinds of releases stated in 2 Bl. Comm. 324, 325. The very plea in Wallwyn v. Lee, 9 Ves. 24, which is given in the appendix of Mr. Beames's work on Pleas in Equity, was of a conveyance by lease and release. And certainly it would have made no difference, if the lease, instead of being a contemporaneous act, had been an existing lease in privity of estate. It is true, that in Wallwyn v. Lee, there were covenants, that the releasor was seised of a perfect, absolute, and indefeasible estate in fee simple in the premises. But I am not aware, that any covenant of this sort, or any covenant of general warranty has ever been held necessary to entitle the purchaser to make the defence. It ordinarily affords very conclusive proof, that the purchase is of the whole estate, and not of the mere right or title of the party, whatever it may be. But if it is apparent from the whole transaction, that the purchaser bought the estate under circumstances, which demonstrate, that he had no suspicion of the title not being perfect, as by giving a full price for an unquestionable and unquestioned fee simple, it seems to me, that the absence of any covenants of general warranty ought not to take away from him the common pro-

tection. He has, under such circumstances at least, an equal equity with any person claiming under an outstanding and unknown trust; and if so, the legal title, combined with his equity, ought not to be disturbed. In the present case the release of Mann to Fuller must, as I think, be treated as a bargain and sale or other lawful conveyance, upon the doctrine already asserted by the Massachusetts courts, which seems to me founded in sound sense and solid legal reasoning. It was an effectual conveyance to pass the whole estate to Fuller; and, as far as we have any means of knowledge, the title, which actually passed, is perfect as to all persons but Flagg. It steers wide, therefore, of the doctrine in Vattier v. Hinde, 7 Pet. [32 U. S.] 271. Flagg's title is founded upon a constructive equity, not apparent upon any of the title deeds; and being secret and unknown to Fuller, cannot be allowed to prejudice Fuller's rights.

In this view of the case as to Fuller, the point, as to the supposed acquiescence of Flagg in the purchase, and thereby giving it an indirect confirmation, becomes unimportant to be considered. It appears to me, indeed, that this point cannot upon the evidence be maintained. The doctrine stated at the bar is well founded, that, in order to make such acquiescence binding on Flagg, it should be proved, that he had full knowledge of all the facts affecting his legal and equitable rights; and that, with such knowledge, he did some open unequivocal act confirmatory of or recognising the validity of Fuller's title; or that by his silence the latter was purposely and injuriously misled into the belief, that his title was valid, and that Flagg did not mean to controvert it. In Cockerell v. Cholmeley, 1 Russ. & M. 425, Tam. 445, the master of the rolls said: "In equity it is considered, as good sense requires it should be, that no man can be held by any act of his to confirm a title, unless he is fully aware at the time, not only of the fact, upon which the defect of title depends; but of the consequence in point of law." Cholmondeley v. Clinton, 2 Mer. 362, and Shine v. Gough, 1 Ball & B. 444, 445, are not so direct; but they presuppose the same principle.

The next and last point, under this head, is, as to the purchase money unpaid by Fuller. If his title to the land is to be deemed good and valid, as in my judgment it is, then it is clear, that the plaintiff has the same lien for his share thereof, as he would have had for the like share in the land itself, if it had remained in the hands of Mann. The one fund is but a substitute for the other, with this qualification, that it is the purchase money unpaid at the time, when Fuller had notice of the plaintiff's equity. My impression is, that upon the evidence, that will be found not to have been earlier than October, 1831. It may possibly have been at a somewhat later period. But, that can, if necessary, be more accurately ascertained by the master.

I have thus gone over the main grounds of this extremely complicated cause. Many other incidental topics, both of law and of evidence, were urged at the hearing, which have not escaped my subsequent notice; but which would unnecessarily encumber this voluminous case. It is sufficient to say, that they have had no tendency to shake my opinion upon the merits of the case, or upon the points already discussed.

Upon the whole my judgment is, that the plaintiff is entitled to a decree declaring him in equity entitled to one moiety of the land purchased by Mann of Walker and Fisher, and of the Frye heirs, which was conveyed to the plaintiff and Mann by Richardson's deed to them. That moiety having been sold by Mann to Fuller, the plaintiff is entitled to a moiety of the purchase money, as a substituted fund, deducting therefrom all the sums, which have been paid by Mann on account of the same lands to Walker and Fisher and to the Frye heirs, and all other expenses incurred in the premises.[4] As the conduct of Mann in these purchases, and in the sale to Fuller, was a constructive fraud upon the plaintiff, I incline to think, that the decree ought to be, that Mann should pay the amount, that shall thus be found due to the plaintiff, after the deductions aforesaid, out of the purchase money received by him from Fuller, if sufficient shall have been received for this purpose, together with interest upon the sums so received; and that there ought to be a decree against Fuller for any deficiency in the amount due to the plaintiff, not paid by Mann; for which also there is, and ought to be, as a part of the unpaid purchase money, a lien on the land in the possession of Fuller. These last, however, are matters, which can be properly adjusted, when the cause comes before the court for a final decree. At present, there must be an interlocutory decree, referring it to a master to examine and report to the court, what sum upon the principles above stated is due to the plaintiff, with such explanatory remarks, as he may think proper to bring to the view of the court upon the suggestion of either party.

From what has been already said, the bill will ultimately, though not at present, be dismissed as against Adams. But, from all the circumstances of the case I do not think, that he stands in a predicament to be entitled to costs; for he has been very properly made a party; and indeed he has been so much mixed up with some parts of the transaction, as a dux facti, as to create some doubts, if he was wholly ignorant of the plaintiff's equity.

---

[4] See Fox v. Mackreth, 2 Cox, 320, 2 Brown, Ch. 400, which seems to have proceeded on similar principles.

The decree was as follows:

This cause came on to be heard upon the original and supplemental suit, before the Honorable JOSEPH STORY, associate justice of the supreme court of the United States, and the Honorable JOHN DAVIS, district judge of the district aforesaid, at this present term, in the presence of the counsel on both sides. Whereupon, and upon debate of the matter and hearing, the defendants' answers, and the testimony and proofs taken and read in the said cause, and of what was alleged by the counsel on both sides, the said court doth think fit, and doth declare, that there is full proof of the agreement of the said Flagg and Mann, for the purchase of the right and title of the said Luther Richardson, and also for the purchase of the title of the Frye heirs, in the premises on joint account, as in the said bill is mentioned; and that the said agreement is now in full force, it never having been abandoned by the voluntary consent of both of the parties. And doth further declare, that at the time of the said purchase, from the said Luther Richardson by the said Flagg and Mann in the bill mentioned, the said Luther was seized and possessed of an equity of redemption in the premises, and that the said Walker and Fisher were seized and possessed of the premises in mortgage, and not of an absolute irredeemable estate therein; and that the said Flagg and Mann became entitled to the equity of redemption of the same, under and in virtue of the purchase from the said Luther Richardson, as aforesaid. And doth further declare, that the purchases subsequently made by the said Mann from Walker and Fisher, and from the Frye heirs, ought to be deemed in equity as purchases for the joint account of the said Flagg and Mann, as in the said bill is mentioned, and not for the sole account of the said Mann; and that the said Flagg is, and ought now to be, entitled to the benefit of a moiety of the said purchases, he paying and allowing to the said Mann one moiety of the moneys paid, and costs and charges, incurred in the same purchases. And doth further declare, that, inasmuch as the said Mann was, at the time of the sale of one moiety of the premises to the said Adams, fully and absolutely entitled to the said moiety, in his own right, that the conveyance to the said Adams is, and ought to be, deemed free from any equity of the said Flagg therein; but that the said Adams is not, under all the circumstances, entitled to any costs. And doth further declare, that the said Fuller is, and ought to be, deemed a bonâ fide purchaser for a valuable consideration, without notice of the equity of the said Flagg in the other remaining moiety of the premises, and, therefore, is entitled to hold the same free of any equity claim and lien of the said Flagg therein, except as to so much of the purchase money as was unpaid when he the said Fuller had full notice of the said Flagg's equity and claim to the premises, as the same equity and claim are affected in the bill; for all which it is hereby declared, that there is a lien on the premises for the benefit of the said Flagg. And doth further declare, that the said Mann, in the said sale of the premises to the said Fuller, as is in the bill mentioned, without the knowledge or consent of the said Flagg, was guilty of a wrong and constructive fraud upon the rights and equity of the said Flagg, in the premises, and that, therefore, the said Mann is primarily liable to pay over to the said Flagg one moiety of all the purchase money, for which the premises were sold, after deducting therefrom one moiety of the several sums paid by him to the said Walker and Fisher, and to the Frye heirs, for the purchase, assignment, and extinguishment of the interest, right, and title to the premises, and all expenses incident thereto; together with interest upon the same moiety of the same purchase money, from the time when the same was received; if the master shall, under all the circumstances, report any to be due. And the court doth order and decree, that it be referred to Charles Sumner, Esq. appointed a master for this purpose, to take an account of all the moneys received and paid, and expended in the premises; and especially to take an account of all the moneys paid by the said Mann, for the purchases aforesaid, and the expenses incident thereto. And also of all the moneys paid by the said Fuller to the said Mann, and the times when the same were paid, &c.; and whether, and at what time, he had notice of the said Flagg's equity and right in the premises, and what sums now remain due from the said Fuller. And the master is also to report upon all other matters and things, which may be necessary and proper to carry into full effect this interlocutory decree, and especially in regard to interest, &c. &c. And all further orders and decrees are reserved for the further consideration of the court.